IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ROLAND CARLISLE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| -v- | : | |
| | : | FILE NO. 1:14-cv-00515-TWT-LTW |
| NATIONAL COMMERCIAL | : | |
| SERVICES, INC., EXPERIAN | : | |
| INFORMATION SOLUTIONS, INC., | : | |
| TRANS UNION, LLC, and EQUIFAX | : | |
| INFORMATION SERVICES, LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| ———————————————— | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF ROLAND CARLISLE'S MOTION FOR
DEFAULT JUDGMENT AGAINST  DEFENDANT
<u>NATIONAL COMMERCIAL SERVICES, INC.</u>**

Plaintiff Roland Carlisle files this Memorandum of Law  in support of his

Motion for Default Judgment against Defendant National Commercial Services, Inc.

(the "Motion").  Under the Fair Debt Collection Practices Act, Plaintiff Carlisle seeks

a default judgment against Defendant National Commercial Services, Inc. ("NCS")

for its conduct as a "debt collector" while attempting to collect a debt Plaintiff

allegedly owed to Thrifty Auto Rental.  Since violations of the FDCPA are violations

of the Georgia Fair Business Practices Act, Plaintiff Carlisle seeks actual and treble damages against NCS under the GFBPA.

Under the Fair Credit Reporting Act, Plaintiff Carlisle seeks a default judgment against NCS as a "furnisher" of information to Defendant Trans Union, Inc. ("Trans Union"), Defendant Equifax Information Services, LLC ("Equifax") and Defendant Experian Information Solutions, LLC ("Experian") (hereinafter collectively referred to as the "CRAs"). NCS inaccurately reported the amount of the alleged debt as well as failing to report the debt as disputed. Defendant NCS failed to conduct a reasonable investigation of the multiple disputes Mr. Carlisle made to the CRAs. Finally, in a tour de force of furnisher intransigence, NCS returned to reporting an inflated amount of the debt as owed after Mr. Carlisle disputed the debt via the CFBP which resulted in the "Credit Grantor" determining that the debt was paid in full.

In November 2012, Thrifty placed the debt it alleged Mr. Carlisle owed for collection with Defendant NCS. In February 2013, after receiving a voice mail, Mr. Carlisle contacted NCS and disputed the debt. At this juncture, Defendant NCS could have investigated Mr. Carlisle's dispute as it stated it would. However, NCS failed

to investigate the debt and to send Mr. Carlisle the required G Notice[1] short circuiting the FDCPA's dispute mechanism.  Suggesting that NCS dismissed Mr. Carlisle's dispute out of hand, NCS also immediately reported the Thrifty Tradeline to the CRAs and failed to note that Mr. Carlisle had disputed the debt.  Thereafter, each of the seven times Mr. Carlisle disputed the Thrifty tradeline through the CRAs, NCS perfunctorily verified the account as accurate.  NCS's delicts thwarted a resolution of the disputed Thrifty Account and lead to the parade of horribles of Mr. Carlisle suffering emotional distress and loss of credit opportunity for which he seeks recompense.

On at least five occasions, Mr. Carlisle  disputed the Thrifty tradeline with Equifax. NCS's does not appear to have done any "investigation" other than check its own limited records.  Furthermore, NCS never provided the details requested by Equifax again suggesting that NCS did not conduct an reinvestigation because NCS's own records did not have the details Equifax requested.  Rather than conduct a reasonable reinvestigation NCS merely "verified" the account as being accurately reported and continued to fail to report the tradeline as disputed.  Thus, NCS thwarted

---

[1] 15 U.S.C. § 1692g requires that certain information be provided to a consumer of her rights under the Fair Debt Collection Practices Act. See pp. 22-23, *infra.*

3

the FCRA dispute process by failing to conduct a reasonable reinvestigation of Mr. Carlisle's disputes.

On May 29, 2013, Mr. Carlisle filed a complaint/dispute with the Consumer Finance Protection Bureau ("CFBP") that the Thrifty tradeline was inaccurate and that NCS was not conducting a proper reinvestigating. In response to the CFBP dispute, Equifax spoke with the CFBP and apparently the Credit Grantor and noted that the Credit Grantor stated the debt had been paid in full. This change resulted in the Thrifty tradeline being reported correctly. However, NCS reverted to trying to pressure Mr. Carlisle in to paying on the debt by reporting a balance of over $2,000 owing by March 2014. Despite this change, NCS continued to report the debt as owing to Defendants Experian and Trans Union. When Mr. Carlisle subsequently disputed the Thrifty tradeline with Experian and Trans Union, NCS verified the accuracy of the tradeline.

Pursuant to Federal Rule of Civil Procedure 55(b)(2), Mr. Carlisle requests that the Court enter a default judgment against Defendant NCS:

1. On Count I of the Complaint, for actual and statutory damages caused by Defendant NCS's violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692o;

2.     On Count IX of the Complaint, for treble damages against Defendant NCS for its actions violating the FDCPA which actions also violate the Georgia Fair Business Practices Act ("GFBPA"), O.C.G.A. § 10-1-390 *et seq.*; and

3.     On Count VIII of the Complaint, for damages against Defendant NCS for negligent and willful actions as a "furnisher" of information in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x.[2]

Under the FDCPA, Mr. Carlisle seeks statutory damages of $1,000.00, *See 15 U.S.C. § 1692k(a)(1).*   Under the GFBPA, Mr. Carlisle seeks an award of general damages of $12,500.00 and requests that the Court treble the damages to $37,500.00. *O.C.G.A. § 10–1-399(c).*   Under FCRA, Mr. Carlisle seeks an award of $12,500.00 in actual damages for injuries caused by Defendant NCS's negligent violations of FCRA and $75,000.00 for Defendant NCS's wilful violations of FCRA.   After reciting the relevant facts,  Mr. Carlisle will demonstrate why he is entitled to the grant of default judgment on his claims.

## I. STATEMENT OF FACTS

On June 15, 2012,  Mr. Carlisle rented a car from Thrifty Car Rental

---

[2]As provided for by each statute, Mr. Carlisle also seeks an award of attorney's fees under the FDCPA, the GFBPA and FCRA.

("Thrifty") for the purpose of taking a trip to see family.[3]   As a result of Mr. Carlisle being arrested during a traffic stop, the rental car was impounded by the police. Thereafter, Thrifty claimed that Mr. Carlyle was liable for additional charges associated with the impoundment (herein after referred to as the "Thrifty Debt").

After the rental car was reacquired by Thrifty, Thrifty sent Mr. Carlisle various letters requesting additional payment.  For example, on August 10, 2012, Thrifty sent Mr. Carlisle a letter stating that $802.00 was owing.  Exhibit B, RCDEC. Because of numerous inconsistences in the amounts Thrifty was seeking, in August and September 2012, Mr. Carlisle had numerous phone conversations with Thrifty seeking an explanation as to the amounts Thrifty claimed were owed.[4]  However, Mr. Carlisle could not reach an understanding with Thrifty of the amount owed.

On September 25, 2012, JNR Adjustment, Inc. ("JNR") sent Mr. Carlisle a Letter seeking to collect $882.50 for a debt to "DTAG RENTAL" JNR Letter of September 25, 2012 (hereinafter referred to as the "JNR Letter" is attached as Exhibit

---

[3]¶2, Declaration of Roland Carlisle in Support of Motion for Default Judgment (hereinafter referred to as "RCDEC").

[4]An example of the inconsistent demands of Thrifty is that on August 8, 2012, Thrifty sent Mr. Carlisle a letter regarding the Chrysler rental stating that $1,017.41 was owed.  ¶3, RCDEC.

E, RCDEC.  After receiving the JNR Letter, Mr. Carlisle contacted JNR and told them the bill was incorrect and that he disputed the bill.  In response a representative of JNR told Mr. Carlisle that they would terminate their collection activity with respect to Thrifty's claim.

On November 14, 2012, Thrifty contracted with Defendant NCS to collect the Thrifty Debt allegedly owed by Mr. Carlisle.[5]  On February 22, 2013, a representative of Defendant NCS left a voice mail on Mr. Carlisle's phone asking that he return the call.  On the same day, Mr. Carlisle returned the call and spoke with a representative of NCS who called herself "Linda."  After Mr. Carlyle explained to Linda that he did not agree with the amounts that Thrifty claimed were owing, Linda berated Mr. Carlisle as someone who refused to pay his debts and implied that Mr. Carlisle was a deadbeat.  As Mr. Carlisle's discussion with Linda became acrimonious and heated, Mr. Carlisle terminated the telephone call.

Shortly after terminating the call, Mr. Carlisle called NCS back and spoke with a representative of NCS who called himself "Richard." Transcript of Call, Exhibit F, RCDEC.  Mr. Carlisle again explained that there was a discrepancy with the NCS debt. *Id.* Richard stated that there were no supporting documents attached to Mr. Carlisle's file.  *Id.* Richard stated that he would contact Thrifty and request the

---

[5]Exhibit T, RCDEC, ACDV of 3/14/2014.

supporting documentation. *Id.*   Once the supporting documentation was received Richard stated that he would call Mr. Carlisle back and they could discuss Mr. Carlisle's dispute. *Id.* However, NCS did not call Mr. Carlyle back to discuss the matter.  ¶33, RCDEC.

Rather, NCS reported the Thrifty Debt to Defendants Equifax, Experian and Trans Union but NCS did not indicate in its reports to the CRAs that the debt was disputed. Id. Furthermore, NCS did not provide a telephone or written disclosure to Mr. Carlyle of his Mini-Miranda rights under by the Fair Debt Collection Practices Act. ¶34, RCDEC.

In February 2013, Mr. Carlisle applied to Associated & Federal Employees Credit Union ("**AFECU**") for a credit card.  ¶38, RCDEC. AFECU initially told Mr. Carlisle that the application could not be approved because there was a "problem with his credit."  Mr. Carlyle learned that the problem was because of the report from Defendant NCS that an outstanding obligation of $1,782.00 was owing on the Thrifty Debt which had caused Mr. Carlisle's credit score to fall, at least, 200 points. ¶38-43, RCDEC

On March 15, 2013 Mr. Carlyle made an on-line dispute with Equifax of the accuracy of the Thrifty tradeline reported by NCS stating that the amount of the debt

was incorrect and requesting that the tradeline be removed from his credit report.[6]

Equifax completed the Automated Consumer Dispute Verification ("ACDV") stating that Mr. Carlyle:

> Dispute 1 [013] DISPUTES CURRENT BALANCE, VERIFY ORIGINAL LOAN AMOUNT, SCHEDULED MONTHLY PAYMENT AMOUNT, ACTUAL PAYMENT AMOUNT, ACTUAL AMOUNT PAST DUE, CURRENT BALANCE.

Equifax ACDV of March, 15, 2013[7], Exhibit G, RCDEC.  Equifax sent the ACDV to NCS which replied by verifying that the account and the balance was being reported

---

[6]The ACDV states:

FCRA Relevant Information The amount of this ????? [debt] is incorrect. I have contacted Thrifty multiple time[s] in order to correct the amount and received no response.  This ??????? is incorrect and should be deleted immediately.

Equifax Automated Consumer Dispute Verification ("ACDV") of March 15, 2013, Exhibit G, RCDEC.  Plaintiff is uncertain why the question mark strings appear and whether this was a keying error by Mr. Carlisle or a transmission error.  However, Equifax understood the basis of Mr. Carlisle's dispute based on its completion of the ACDV.

[7]ACDV's are referred to by the date of creation which appears in the third block down on the left.  Some ACDVs were created as a result of Mr. Carlisle making a dispute on line and the ACDV date of creation is in these instances the same date as the date of the dispute.  In instances in which Mr. Carlisle sent a letter or fax dispute to Equifax, the date the dispute was made will differ from the date of creation of the ACDV.

correctly.[8]  On April 9, 2013, Defendant Equifax replied to the March 15, 2013 dispute stating that we have researched the NCS collection account and stated that NCS has "verified to OUR company that the balance is being reported correctly."  See Equifax Letter of April 9, 2013. Exhibit H to RCDEC. Additionally, Equifax sent an "updated" Credit Report which stated, in relevant part:

> "National Commercial Services: Collection Reported 4/2013: Assigned 11/2012; Client - Thrifty Car Rental: Amount - $1,782; Status as of 4/2013 - **Unpaid**; **Balance as of 04/2013 - $1,892**."
>
> (Emphasis added).

Exhibit I to RCDEC.  As shown from this entry, the reported information with respect to the NCS tradeline does not show that the debt is being reported as disputed.  *Id.*  As of April 9, 2013, after Mr. Carlisle had disputed the Thrifty Debt with Defendant NCS on two occasions directly and, once, through Equifax, Defendant NCS continued to reported the debt to Equifax but failed to report that the debt was disputed. *Id.* On March 4, 2013, AFECU ran Mr. Carlisle's credit with Equifax and based on the information it received declined to offer Mr. Carlisle a credit card. ¶40, RCDEC

---

[8]On the ACDV, NCS checked the box marked "Verified as Reported." Ex.G, RCDEC.

On April 29, 2013, Mr. Carlisle made an on-line dispute with Equifax of the accuracy of NCS's report of the Thrifty tradeline stating that:

> **FCRA Relevant Information** CONSUMER STATES HE SPOKE WITH A SUPERVISOR WITH THE COLLECTION COMPANY THAT STATED HE COULD NOT FIND DOCUMENTATION ON THE ACCOUNT

and Equifax completed the ACDV and requested that Defendant NCS provide the following information:

> **Dispute 1** [013] DISPUTES CURRENT BALANCE - VERIFY ORIGINAL LOAN AMOUNT, SCHEDULED MONTHLY PAYMENT AMOUNT, ACTUAL PAYMENT AMOUNT, ACTUAL AMOUNT PAST DUE, CURRENT BALANC[E].
>
> **Dispute 2** [006] NOT AWARE OF COLLECTION - PROVIDE ID AND VERIFY ORIGINAL CREDITOR NAME AND CLASSIFICATION

Equifax ACDV of April 29, 2013. Exhibit J, RCDEC.

On May 3, 2013 Mr. Carlyle sent Equifax a letter disputing the accuracy of the Defendant NCS's report of the alleged Thrifty Debt which included a copy of the Thrifty Bill of August 2012 and the Letter of September 2012 from JNR Associates.

See Letter of May 3, 2013 from Mr. Carlisle to Equifax.  Exhibit K, RCDEC. On May

6, 2013, Equifax created an ACDV which summarized Mr. Carlisle's dispute letter

stating:

> **FCRA Relevant Information** CONSUMER SENT LETTER FORM
>
> [sic] THRIFTY CAR RENTAL DATED 08102012 WHEREIN
>
> STATED AMOUNT IS STILL OUTSTAING [sic] AND
>
> ACCOUNT HAS BEEN ASSIGNED FOR LIGIGATION [sic] TO
>
> THE LEGAL DEPARTMENT AND JNR OFFERS TO SETTLE
>
> THE AMOUNT

Equifax sent the ACDV to Defendant NCS and requested the following information:

> **Dispute 1** [013] DISPUTES CURRENT
>
> BALANCE - VERIFY ORIGINAL LOAN
>
> AMOUNT [sic], SCHEDULED MONTHLY
>
> PAYMENT AMOUNT, ACTUAL PAYMENT
>
> AMOUNT,  ACTUAL AMOUNT PAST DUE,
>
> CURRENT BALANC [sic]

Equifax ACDV of  May 6, 2013. Exhibit L, RCDEC.  On the May 6, 2013. ACDV,

NCS checked the box marked "Verified as Reported." *Id.*

Next Mr. Carlyle sent Equifax a copy of the Thrifty Bill of August 10, 2012

**12**

and disputed the accuracy of the Defendant NCS's report of the alleged Thrifty Debt.
On May 8, 2013, Equifax created an ACDV which summarized Mr. Carlisle's dispute
letter stating:

> **FCRA   Relevant   Information**   CONSUMER   PROVIDED
> DOCUMENT FROM THRIFTY CAR RENTAL DATED 08 10
> 2012 STATED THERE IS A BALANCE DUE OF DOLLAR 882
> AND 5 SENT [sic] ON RENTAL CONTRACT OZ2076281

Equifax sent the ACDV to Defendant NCS and requested the following information:

> **Dispute   1**   [013]   DISPUTES   CURRENT
> BALANCE - VERIFY ORIGINAL LOAN
> AMOUNT [sic], SCHEDULED MONTHLY
> PAYMENT AMOUNT, ACTUAL PAYMENT
> AMOUNT,  ACTUAL AMOUNT PAST DUE,
> CURRENT BALANC [sic]

Equifax ACDV of May 8, 2013. Exhibit M, RCDEC.

. HISTORY PROFILE, ACCOUNT ST[ATUS][?]

Equifax ACDV of May 25 2013, Exhibit N, RCDEC.

stating that the I had spoken "with a supervisor with the collection company who that
he could not find any documents for this account."

During this period Mr. Carlisle had several conversations with Equifax personnel who requested additional information but failed to understand or care that the information reported by NCS was inaccurate and who repeatedly stated to Mr. Carlisle that it was the responsibility of NCS to correct any inaccuracy. Equifax representatives took the position that they had no duty to evaluate the information provided by Mr. Carlisle as to the NCS's report's inaccuracies no matter how inconsistent and illogical the report was in light of the documents and information which Mr. Carlisle provided.

As a result of Mr. Carlisle's growing frustration with the dispute process on May 29, 2013, Mr. Carlisle filed a complaint with the Consumer Finance Protection Board ("CFPB") regarding the NCS report's inaccuracies and the failure of Equifax and NCS to properly reinvestigate the debt. In response to Mr. Carlisle's CFPB complaint, Equifax created an ACDV on July 1, 2013 which stated:

**FCRA Relevant Information** CFBP COMPLAINT FILED IN WHICH CONSUMER HAS A COPY OF LETTER FROM THRIGTY [sic] SHOWING AMOUNT OWING SHOULD BE $802.50

Equifax sent the ACDV to Defendant NCS and requested the following information:

**Dispute 1** [013] DISPUTES CURRENT BALANCE - VERIFY

> ORIGINAL LOAN AMOUNT [sic], SCHEDULED MONTHLY
>
> PAYMENT AMOUNT, ACTUAL PAYMENT AMOUNT,
>
> ACTUAL AMOUNT PAST DUE, CURRENT BALANC [sic]

Exhibit O, RCDEC.   As a result of a conversation between Equifax and the CFPB on July 31, 2013 and Equifax's further investigation with NCS, the NCS tradeline was updated as:

Credit Grantor Response: UPDATED PER CREDIT GRANTOR

THIS ITEM HAS BEEN UPDATED TO REPORT AS PAID IN FULL.,X15,07/31/13.

ACRO Maintenance Transaction Summary For 07/31/2013, BATES NO. EIS-CARLISLE 000096, a true and accurate copy of the pertinent ACRO Maintenance Transaction Summary BATES NO. EIS-CARLISLE 000092-000097. See Exhibit P, RCDEC. However, at least by April 2014, NCS reverted to reporting the Thrifty Debt as delinquent with a balance of $2,017.00.

On March 3, 2014, counsel for Mr. Carlisle sent a letter to Experian disputing the accuracy of the NCS Thrifty tradeline (hereinafter referred to as the "Experian Dispute Letter"). Exhibit Q, RCDEC. After supposedly "reinvestigating" the tradeline, Defendant NCS replied to Experian that Mr. Carlisle owed Thrifty $2,017.00 and the Payment Status was "seriously past due." Id.  However even at this point, Defendant NCS failed to include in its reply to Experian that Mr. Carlisle had disputed

the debt.  On March 28, 2014, Experian replied to the Experian Dispute Letter with a

Letter stating that:

> [t]his summary shows the revision(s) made to your credit file as a
>
> result of our processing your dispute.
>
> . . . .
>
> How to read your results
>
> **Remains** - The item was not changed as a result of our processing your dispute.
>
> . . . .

| Credit items | Outcome |
| --- | --- |
| NATIONAL COMMERCIAL SE NCS1THRCO20112583 | Remains |

Exhibit R, RCDEC.

On March 3, 2014, Mr. Carlisle through counsel sent a letter to Trans Union

disputing the accuracy of the NCS Thrifty tradeline. Letter of March 3, 2014 from

Dwight Bowen to Trans Union (hereinafter referred to as the "Trans Union Dispute

Letter") Exhibit T, RCDEC. After supposedly reinvestigating the tradeline, Defendant

NCS reported to Trans Union that Mr. Carlisle owed $2,017.00 on the Thrifty Debt and

that the status was "9" which translates to "charged off to bad debt."  On April 4, 2014,

Trans Union informed Plaintiff Carlisle by letter that Trans Union's "investigation of

the dispute you recently submitted is now complete" and the results were "VERIFIED,

NO CHANGE." Trans Union Letter of April 4, 2014, Exhibit U, RCDEC.  In its April 4, 2014 letter, Trans Union enclosed a copy of the NCS tradeline which listed the balance owing on the Thrifty claim as $2,017.00 but did not list the debt as disputed. FACTS on break up, rental apartment and car. *Id.*

## II. ARGUMENT AND CITATION OF AUTHORITY

Plaintiff Carlisle will first discuss the default judgment standard under F.R.Civ.P. 55 and decisional law.  Second, Plaintiff will discuss the purposes and application of the FDCPA.  Third, Plaintiff will demonstrate that Defendant National Commercial Services, Inc. has violated the FDCPA with respect to Mr. Carlisle and that he is entitled to statutory and actual damages.  Plaintiff Carlisle will further show that NCS's violations of the FDCPA constitute violations of the Georgia Fair Business Practices Act entitling Mr. Carlisle to treble damages.  Finally, Mr. Carlisle will show that NCS violated its duties as a "furnisher" of information under FCRA by failing to properly reinvestigate the various disputes Mr. Carlisle made with the CRAs and by willfully reporting inaccurate information to Defendants Experian and Trans Union and by reverting to reporting inaccurate information to Equifax.

## A.   LEGAL STANDARD APPLICABLE TO <u>GRANTING A DEFAULT JUDGMENT</u>

Fed.R.Civ.P. 55 mandates a two-step process to obtain a default judgment. Pursuant to Rule 55(a), a plaintiff moves the Clerk to enter a default when a defendant fails to timely respond to a complaint.  On July 13, 2014, Plaintiff Carlisle moved for the entry of default [Doc. 23] and on July 14, 2014, the Clerk entered the default of Defendant NCS.

To obtain a default judgment when the amount sought is other than for a "sum certain," Plaintiff applies to the Court for a judgment. F.R.Civ.P. 55(b)(2).[9]  Because of the entry of default, the well-pleaded facts in the complaint are established as true.  In discussing whether or not to grant a default judgment, *Protective Life Ins. Co. v. McKinley, 2011 U.S. Dist. LEXIS 136689, *2-3 (S.D. Ala. Nov. 29, 2011*) observed that:

> The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact. . . .  A default judgment is unassailable on the merits but only so far as it is supported by well-pleaded allegations, assumed to be true." *Nishimatsu Construction Co. v. Houston National Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).  Thus, "a default judgment

---

[9]Fed.R.Civ.P. 55(b)(1), in pertinent part, provides that "[w]hen the plaintiff's claim against a defendant is for a sum certain ...., the clerk upon request of plaintiff .... shall enter judgment ...."

cannot stand on a complaint that fails to state a claim." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1371 n.41 (11th Cir. 1997). Rather, "before entering a default *judgment* for damages, the district court must ensure that the well-pleaded allegations of the complaint . . . actually state a cause of action and that there is a substantive, sufficient basis in the pleadings for the particular relief sought." *Tyco Fire & Security, LLC v. Alcocer*, 218 Fed. Appx. 860, 863 (11th Cir. 2007) (emphasis in original).

A motion for default judgment is directed to the Court's discretion. *Banks v. SFRC Med. Dep't Officials,* 2011 U.S. Dist. LEXIS 26401, *17-18 (S.D. Feb. 25, 2011) noted that:

In determining whether a default judgment is appropriate, a court may consider several factors including: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th

**19**

Cir.1986) (citing 6 Moore's Federal Practice, ¶ 55-05[2], at 24-26).

Because the denial of a judgment would be prejudicial to Plaintiff's rights and undermine the Congressional policies set forth in the FDCPA and FCRA, Mr. Carlisle requests that the Court enter a default judgment on all claims brought against Defendant NCS.[10]  Because Defendant NCS's Motion merely demonstrates the failure of NCS to meets its responsibilities and does not demonstrate legally or factually compelling reasons in support of its request, Plaintiff opposes Defendant NCS's Motion to Open Default.

## B.  PURPOSE OF THE FDCPA AND THE LEAST SOPHISTICATED CONSUMER STANDARD

The Fair Debt Collection Practices Act ("FDCPA") was enacted to "eliminate abusive debt collection practices by debt collectors [and] to insure that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged." *15 U.S.C. §1692(e).* "The Act is designed to protect consumers who have been victimized by unscrupulous debt collectors, regardless of whether a valid debt actually exists." *Baker v. G. C. Services Corp.*, 677 F.2d 775, 777 (9th Cir. 1982).  The Act regulates interactions between consumer debtors and "debt collector[s]" *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S. Ct. 1605, 1608 (U.S. 2010).

---

[10]Defendant NCS filed a Motion to Open Default [Doc.[Doc. Xx].

A debt collector who attempts to collect a debt from an individual who does not owe the debt or is the victim of mistaken identity is still subject to liability under the FDCPA.  15 U.S.C. § 1692a(3) defines consumer as "any natural person obligated *or allegedly obligated* to pay any debt." (Emphasis supplied).  Thus, a consumer whom a debt collector contacts seeking to collect a debt but who does not owe the debt is still "allegedly obligated" on a debt and is within the ambit of persons protected by the FDCPA.  *Baker v. G. C. Services Corp., supra.*

The Act prohibits a debt collector from using "any false, deceptive, or misleading representation or means" to collect a debt. *15 U.S.C. § 1692e.*  In determining whether a  debt collector's representations violate § 1692e, the Eleventh Circuit "looks to the tendency of language to mislead the least sophisticated recipients of a debt collector's letters and telephone calls." (Citations omitted).[11]  Under *Jeter,* application of the least sophisticated consumer standard does not require that the consumer bringing the complaint prove that she was deceived or mislead to state an FDCPA claim. *Id., fn.11.*  Furthermore, because the least sophisticated consumer standard protects the "ignorant, the unthinking, and the credulous," a debt collector may

---

[11]*Jeter v. Credit Bureau*, 760 F.2d 1168, 1175 (11th Cir. 1985) (adopting the "least sophisticated consumer" standard for FDCPA claims, the same standard for the FDCPA as that of the Federal Trade Commission Act, which was meant to protect the public, including the "ignorant, the unthinking, and the credulous").

not make statements which the collectors assumes are true while attempting to coax payments from consumers with statements. *Ponce v. BCA Fin. Servs.,* 467 Fed. Appx. 806, 808 (11th Cir. 2012) (Collector who assumed consumer's insurance company would not pay debt and told this to the consumer violated § 1692e(10)); *see also Easterling, v. Collecto, Inc.*, 692 F.3d 229, (2nd Cir. 2012) (collector's statement to student loan obligor that her debt was not dischargeable in bankruptcy misrepresented fact that discharge was possible).

## C. FDCPA VIOLATIONS

### 1. FDCPA Applies to NCS's Collection Activities

To establish a claim under the FDCPA, Mr. Carlisle must show that he is a consumer who owes or is alleged to owe a debt, that the defendant is a debt collector who has attempted to collect a debt which arose out of a consumer transaction and that the debt collector has engaged in activity proscribed by the Act.[12]

In the Complaint, Mr. Carlisle has pled that he is a consumer within the meaning of 15 U.S.C. § 1692a(3).[13]  Mr. Carlisle has also established that Defendant NCS is a debt collector in that it regularly collects or attempts to collect debts for

---

[12]*See Morgan v. Credit Adjustment Board, Inc.*, 999 F.Supp. 803 (E.D.Va. 1998).

[13]Complaint, ¶41.

others.[14]  Mr. Carlisle also established that the debt arose out of a consumer transaction, i.e. his rental of a motor vehicle for personal use.[15]  Let us turn to a discussion of Defendant NCS's violations of specific provisions of the FDCPA.

## 2.Defendant NCS violated 15 U.S.C. § 1692g(a)

The Complaint alleges that Defendant NCS's actions violated 15 U.S.C. § 1692g(a)[16] because Defendant NCS did not send Mr. Carlisle the required Section 1692g Notice.[17]  The G Notice provides important information to a consumer regarding

---

[14]15 U.S.C. §1692a(6),Complaint ¶44.

[15]Complaint, ¶42. *See Brown v. Budget Rent-A-Car Sys., Inc*., 119 F.3d 922, 924 (11th Cir.1997) (car rental charges are a "debt" covered by FDCPA).

[16]Complaint, ¶45.

[17]15 U.S.C. § 1692g(a) states that:

 Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing –
(1)  the amount of the debt;
(2)  the name of the creditor to whom the debt is owed;
(3)  a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;
(4)  a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy

her right to dispute the debt or to seek verification.[18]   The Senate considered the G Notice to be a "*significant feature*" of the FDCPA because it was thought that the G Notice would eliminate duns being pursued against the wrong person or attempts to collect a debt which has been paid.[19]

The G Notice and the consumer's rights thereunder creates an informal method of dispute resolution.  The failure to send the G Notice short circuits this dispute resolution mechanism.  Such a failure undermines the ability of the least sophisticated consumer to learn of her rights  to dispute debts which are not hers, have been paid or even discharged in bankruptcy.

When a collector initially communicates with a consumer by telephone and

---

of such verification or judgment will be mailed to the consumer by the debt collector; and

(5)  a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

[18]"This legislation was designed to protect a consumer who is not aware of the complexities of the law and therefore must be given notice adequate to inform him of his rights under the law."  *Ost v. Collection Bureau, Inc.*,493 F. Supp. 701, 702 (D.N.D.1980)

[19]"This provision will eliminate the recurring problem of collectors dunning the wrong person or attempting to collect debts which the consumer has already paid." S.Rep. No. 382, 95th Cong., 1st Sess. 4 at 4 *reprinted in* 1977 U.S. Code Cong. & Admin. News 1695, 1699.

does not provide the Section 1692g information over the phone then the collector must within five (5) days send the required information to the consumer.[20] *Ponce,* 467 Fed. Appx. at 807-808 (Collector's initial phone call to consumer without providing Section 1692g Notice triggers collector's obligation to send Section 1692g Notice within five days). Failing to send the Notice within five days of the initial communication is a violation of the FDCPA. *Id.*

On February 22, 2013, Mr. Carlisle spoke with NCS by phone which was his first communication with NCS. ¶18, RCDEC. Thus, NCS was required to communicate the Section 1692g information during the phone call or provide Mr. Carlisle a Section 1692g Notice within five days of the phone conversations or no later than February 27, 2013. *Id.* However, NCS failed to provide the Section 1692g information during the phone calls or send the Section 1692g Notice at all. ¶¶30,21, RCDEC. Because it failed to timely send the G Notice, NCS violated the FDCPA and Mr. Carlisle is entitled to an award of damages for said violation. *Ponce v. BCA Fin. Servs., supra.*

### 3. Defendant NCS violated 15 U.S.C. § 1692e(8)

15 U.S.C. § 1692e(8), in pertinent part, provides:

A debt collector may not use any false, deceptive, or misleading

---

[20]The Fair Debt Collection NCLC manual argues that the G Notice must be in writing but case law on this point is sparse. Section 5.7.2.4, FAIR DEBT COLLECTION (Seventh Ed. 2011). *Ponce* left this question undecided.

representation or means in connection with the collection of any debt.

Without limiting the general application of the foregoing, the

following conduct is a violation of this section:

. . .

(8) Communicating or threatening to communicate to any

person credit information which is known or which should be known

to be false, *including the failure to communicate that a disputed debt*

*is disputed.* (Emphasis supplied).

15 U.S.C. § 1692e(8).   Defendant NCS violated this section by reporting the alleged

Thrifty Debt to Defendants Equifax, Experian and Trans Union without stating that the

debt was disputed. See, e.g. p.3, Equifax Credit Report of April 9, 2013, Exhibit H,

RCDEC.  In asserting this violation Plaintiff relies on the fact that in his conversation

with NCS on February 22, 2013, he clearly stated that he disputed the amount of the

debt in question.  ¶¶22-33, RCDEC.

The consumer's right to dispute a debt is set forth in 15 U.S.C. § 1692g(a)(3)

which states that the Section 1692g Notice to the consumer must include:

a statement that *unless the consumer*, within thirty days after receipt

of the notice, *disputes the validity of the debt, or any portion thereof,*

*the debt will be assumed to be valid by the debt collector.* (Emphasis

Supplied).

The Circuit Courts have reached differing conclusions about whether a consumer may orally dispute a debt and thereby invoke certain FDCPA provision regarding disputed debts. *Camacho v. Bridgeport Financial, Inc.*, 430 F.3d 1078 (9th Cir. 2005) interprets Section 1692g(a)(3) to permit a consumer to orally dispute a debt. *Id.* at 1080-82.  The Third Circuit in *Graziano v. Harrison*, 950 F.2d 107 (3d Cir. 1991), ruled that § 1692g(a)(3) requires a consumer to dispute his debt in writing. *Id.* at 111-12.  *Camacho* relied on the plain meaning of the words of the FDCPA to determine that Section 1692g(a)(3) did not express a writing requirement. *Camacho's* reasoning has also recently been adopted by the Second and Fourth Circuits.  *Hooks v. Forman, Holt, Eliades & Ravin, LLC,* 717 F.3d 282 (2nd Cir. 2013); *Clark v. Absolute Collection Service, Inc.*, 741 F.3d 487 (4th Cir. 2014).  *Camacho's* reasoning has also been followed by courts in the Eleventh Circuit and appears to constitute the weight of authority. *See Guerrero v. Absolute Collection Serv.*, at *9-10, 2011 U.S. Dist. LEXIS 155541(N.D. Ga. Oct. 6, 2011) (Section 1692g Notice which requires consumer dispute to be in writing violates 15 U.S.C. § 1692g(a)(3)).

In *Guerrero*, Magistrate Judge Vineyard observed that:

At least two courts in the Eleventh Circuit have followed the Ninth

Circuit's reasoning in *Camacho*. *See e.g., In re Turner,* 436 B.R. 153,

27

157-58 (M.D. Ala. 2010); *Baez v. Wagner & Hunt, P.A.*, 442 F. Supp. 2d 1273, 1276-77 (S.D. Fla. 2006). Furthermore, "the weight of the authority from the district courts [shows] that § 1692g(a)(3) of the FDCPA should be interpreted to allow consumers to dispute the validity of their debt in ways other than writing." *In re Turner*, 436 B.R. at 158 (quoting *Campbell v. Hall,* 624 F. Supp. 2d 991, 1000 (N.D. Ind. 2009)). There is no similar recent trend of support for the *Graziano* court's position.

*Id.*[21] Because *Camacho* correctly parsed Section 1692g(a)(3) to permit a consumer to orally dispute a debt and because such a construction comports with the Congressional purpose in enacting the FDCPA, the Court should rule that the FDCPA permits a consumer to orally dispute the validity of the debt under Section 1692g(a)(3).

As *Comacho* observed, one result of the consumer orally disputing a debt is that:

> Oral dispute of a debt precludes the debt collector from communicating the debtor's credit information to others without including the fact that the debt is in dispute. 15 U.S.C. § 1692e(8);

---

[21]*See also Busch v. Valarity, LLC*, at *9-12, 2014 U.S. Dist. LEXIS 14569 (E.D. Mo. Feb. 5, 2014) (Collecting cases and following *Camacho* as the better reasoned decision).

*Brady v. Credit Recovery Co.*, 160 F.3d 64, 67 (1st Cir. 1998).

*Id.* at 1082.  In *Brady*, the consumer orally contested the debt and the collector was held to violate Section 1692e(8) by failing to include the fact of the consumer's dispute in its report to a credit reporting  agency. *Id.*

Other courts have applied section 1692e(8) to reports of information which fail to include that fact that the debt is disputed. *Purnell v. Arrow Fin. Servs.*, LLC, 2008 U.S. App. LEXIS 25488 (6th Cir. 2008) (Each report of disputed debt to CRA without noting dispute violated Section 1692e(8)); *Gilmore v. Account Mgmt., Inc.*, 2009 U.S. Dist. LEXIS 79508, Magistrate Judge Report & Recommendation at *21-22 (N.D.Ga. April, 27, 2009) (Reporting disputed debt to CRA without noting dispute violated Section 1692e(8)).  The FTC has issued commentary on the FDCPA which clarifies a debt collector's duties under § 1692e(8).  The FTC Commentary explains:

> If a debt collector knows that a debt is disputed by the consumer . . .
> and reports it to a credit bureau, [the debt collector] must report it as
> disputed.

 *See FTC Staff Commentary, 53 Fed. Reg.* at 50106 (Dec. 13, 1988).

On February 22, 2013, Mr. Carlisle disputed the accuracy of the debt in two different phone calls with representatives of NCS. ¶ ¶22-33, RCDEC. Thereafter on April 7, 2013, in response to Mr. Carlisle's dispute of the NCS tradeline regarding the

Thrifty Debt, NCS verified the debt to Equifax but failed to note that the debt was disputed. *See*   p.3, Equifax Credit Report of April 9, 2013, Exhibit H, RCDEC. Furthermore, NCS continued to report the Thrifty Debt to Experian and Trans Union in April, 2013 and in the months thereafter while failing to note that the debt was disputed. Thus, Defendant NCS violated section 1692e(8) by failing to include in its response to the investigation of the Thrifty Debt requested by Equifax that the Thrifty Debt had been disputed by Mr. Carlisle. *Brady v. Credit Recovery Co.*, *supra.*  Furthermore, NCS violated Section 1692e(8) by failing to include a notice of the dispute in its monthly reports of the NCS tradeline concerning Mr. Carlisle to Experian and Trans Union for the period from April 2013 through, at least, December 2013.[22]

### 3. Defendant NCS violated 15 U.S.C. § 1692e(2)(a)

Section 1692e(2)(a) states that:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

. . .

(2)  The false representation of--

---

[22]*Wilkins, Jr. v. Global Credit & Collection Corp*., *supra*.; *Pettit v. Retrieval Masters Credit Bureau, supra*; *Gearing v. Check Brokerage Corp., supra.*

   (A)  the character, amount, or legal status of any debt;

*15 U.S.C. § 1692e.*

A debt collector violates this provision if the collector misstated the character or amount of debt. *See, e.g., Dutton v Wolhar*, 809 F Supp 1130, (D. Del.1992) *affd* 5 F3d 649 (3rd Cir. 1993) (Collector violated provision by sending letter to mother that she owed debt when debt was owed by her daughter).  "The FDCPA imposes strict liability on the debt collector for misstatements of the amount owed and thus, does not require a showing of intentional conduct on the part of a debt collector."  *Gilmore v. Account Mgmt*., 2009 U.S. Dist. LEXIS 79508 at *20-21 (N.D. Ga. Apr. 27, 2009) (Analyzing misstatement of amount of debt as a Section 1692e violation).

A collector has an obligation under 15 U.S.C. § 1692e(2)(A) "to provide a consumer with a statement of the amount owed." *Veach v. Sheeks,* 316 F.3d 690, 693 (7th Cir. 2003).  Where the collector states the amount owed is $10,277.56 when in fact $ 402.78 is owed, the collector violates Section 1692e(2)(A).  *Goins v. JBC & Assocs., P.C.,* 352 F. Supp. 2d 262, 269 (D. Conn. 2005); *see also  Hepsen v. Resurgent Capital Servs*., LP, 383 Fed. Appx. 877, 883 (11th Cir. 2010) (Collection letters with differing amounts support inference that the amount of the debt has been misstated).  Where the original creditor has sent the consumer a letter stating that the amount of the debt is $885.50 and the collector is claiming that over $1,700 is owing, the collector has

violated Section 1692e(2)(A). *Goins, Veach, Hepsen, Gilmore*.

## 4. GEORGIA FAIR  BUSINESS PRACTICES ACT

Mr. Carlisle asserts a claim for violation of the Georgia Fair Business Practices Act ("FBPA"), O.C.G.A. §§ 10-1-390-407.[23]  The FBPA's purpose is to "protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce." [24]  The FBPA "is to be liberally construed and applied to promote its underlying purposes and policies, which are to protect consumers."[25]

### a. GFBPA is applicable to Debt Collection

The applicability of the FBPA to debt collecting was addressed by the Eleventh Circuit in *Gilmore v. Account Management, Inc.,* 357 Fed. Appx. 218 (11th Cir 2010). *Gilmore* considered this question in light of the ruling in *1st Nationwide Collection Agency, Inc. v. Werner, 288 Ga. App. 457, 654 S.E.2d 428* (2007) which had ruled that a consumer could obtain damages under both the FDCPA and the GFBPA for a

---

[23]Complaint, Count IX.

[24]O.C.G.A. § 10-1-391(a).

[25]*Standish v. Hub Motor Co.*, 149 Ga. App. 365, 366, 254 S.E.2d 416 (1979).

collectors unfair and deceptive collection activities. *Werner* based its ruling on the statement of purpose in the FBPA that:

> It is the intent of the General Assembly that this part be interpreted
>
> and construed consistently with interpretations given by the Federal
>
> Trade Commission in the federal courts pursuant to Section 5 (a) (1)
>
> of the Federal Trade Commission Act (15 USC Section 45 (a) (1).

*Gilmore* held that there was ample justification based on the GFBPA statement of purpose to apply its provisions to debt collectors who are part of the collection industry.[26] *Gilmore* went on to hold in reliance on *Werner* and the FBPA statutory language that a violation of the FDCPA by a debt collector "necessarily [violates] Georgia's FBPA when it [violates] the FDCPA."[27]

Based on the holding in *Gilmore*, NCS's violations of the FDCPA with respect to its failure to send the G Notice, the failure to report the account as disputed when reporting the account to the CRAs and the misstatement of the amount owed are also violations of the GFBPA. In fact, many of the sections of the FDCPA violated in *Werner* are the same sections which Mr. Carlisle contends were violated by Defendant

---

[26]*Gilmore v. Account Management, Inc., supra,* (citing *1ˢᵗ Nationwide Collection Agency, Inc. v. Werner,* 288 Ga. App. 457, 654 S.E.2d 428 (2007)).

[27]*Id.* at 220.

NCS.[28]

    b. <u>Damages</u>

    Mr. Carlisle requests that the Court award damages against Defendant NCS for

its violations of the FDCPA and the GFBPA.  Under the FDCPA, Mr. Carlisle requests

an award of the maximum statutory damages of $1,000.00. *See 15 U.S.C. § 1692k(a)(1).*

Under the GFBPA, Mr. Carlisle seeks an award of general compensatory damages of

$12,500.00 and treble damages of $37,500.00. *See O.C.G.A. § 10–1-399(c).*

    Mr. Carlisle requests that the Court award damages without holding a hearing.

In calculating the amount of damages to be awarded on a Motion for default judgment,

the Court may order an evidentiary hearing.  However, if there is evidence in the record

supporting an award, the Court need not hold a hearing.  *Nishimatsu Construction Co.*

*v. Houston National Bank,* 515 F.2d at 1232, fn.13.   *Fustok v. Conti-Commodity*

*Services, Inc*., 873 F.2d 38, 40 (2d Cir. 1989) observed that "it [is] not necessary for the

District Court to hold a hearing, as long as it ensured that there was a basis for the

---

    [28]*1st Nationwide Collection Agency, Inc. v. Werner*, 288 Ga. App. 457, 459 (Ga. App. 2007) considered whether Nationwide violated the FDCPA after a trial court had dismissed Nationwide's collection suit against Werner with prejudice.   In holding that Nationwide violated the FDCPA, the court stated:
> The record further shows that even after Nationwide's collection case had been dismissed, Nationwide continued to communicate incorrect balance information which it knew to be false in Werner's credit reports, knowingly violating 15 USCS §§ 1692e, *1692e (2) (A)*, *1692e (8)* and 1692e (10). (Emphasis supplied)

damages specified in the default judgment."  Considering the well-pleaded factual allegations of the Complaint, the Bowen Declaration and the Carlisle Declaration there is sufficient evidence in the record to support the entry of a default judgment in the amount requested.

**1. Damages Caused Mr. Carlisle by NCS'S  Violations of the FDCPA**

The FDCPA provides that in addition to actual damages that a consumer may recover " such additional damages as the court may allow, but not exceeding $1,000.00." 15 U.S.C. § 1692k(a)(2)(A).  As noted by the Supreme Court, "it is a fair inference that Congress chose to permit injured consumers to recover actual damages, costs, fees, and *modest statutory damages* for 'intentional conduct'" which violates the Act.[29]

1. FDCPA Statutory Damages

The  FDCPA  is  a  strict  liability  statute.[30]  Once  the  consumer  shows  the collector's conduct violated the Act, statutory damages may be awarded under 15 U.S.C.

---

[29]*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, LPA*, 130 S. Ct. 1605, 1612 (U.S. 2010).

[30]"The FDCPA does not ordinarily require proof of intentional violation and, as a result, is described by some as a strict liability statute." *LeBlanc v. Unifund CCR Partners,* 601 F.3d 1185, 1190 (11th Cir. 2010) (*citing* 15 U.S.C. § 1692k; *Ellis v. Solomon and Solomon, P.C.,* 591 F.3d 130, 135 (2d Cir. 2010)).

§ 1692k. The consumer need not prove the debt invalid or show any actual damages to receive statutory damages.[31]

In the instant case, Mr. Carlisle requests $1,000.00 statutory damages because of the significant number of violations and the nature of the violations which joined to worsen their effect on Mr. Carlisle. *Yelvington v. Buckner*, 1984 U.S. Dist. LEXIS 24890 (N.D. Ga. Dec. 7, 1984) stated that:

> [i]n determining the amount of liability in an individual action, the court should consider (1) the frequency and persistence of non-compliance, (2) the nature of such noncompliance, and (3) the extent to which such noncompliance was intentional. 15 U.S.C. § 1692k(b)(1).

Finding that all three factors were present, *Buckner* stated that the "violations were substantive and egregious such as threatened garnishment, illegal service charges, harassing phone calls, etc." and therefore warranted the maximum statutory award of $1,000.00.[32] The three FDCPA violations present in this case are likewise "substantive

---

[31]*Baker v. G.C. Services Corp.*, 677 F.2d 775 (9th Cir. 1982); *Harvey v. United Adjusters*, 509 F. Supp. 1218 (D. Or. 1981); *Carrigan v. Central Adjustment Bureau, Inc.*, 502 F. Supp. 468 (N.D. Ga. 1980).

[32]*Florence v. National Sys.*, 1983 U.S. Dist. LEXIS 20344, *12-13 (N.D.Ga. 1983)*, stated that in awarding statutory damages the court should

and egregious" because the violations of failing to send the G Notice,[33] misstating the amount of the debt and failing to report the debt as "disputed" created a perfect storm which contributed to erroneous information appearing on Mr. Carlisle's credit reports and caused Mr. Carlisle's emotional distress.[34] Taking into consideration the frequency and persistence of non-compliance, the nature of the non-compliance and the extent to which noncompliance was intentional, Mr. Carlisle requests a maximum statutory award of $1,000.00.

### 2. General Damages

Mr. Carlisle requests that he be awarded general damages of $12,500.00 as

---

consider "the legislative purpose in providing for an effective private enforcement mechanism of the FDCPA as well as the deterrent effect upon abusive collection attempts."

[33]The importance of the G Notice is reflected in cases litigating the issue of whether the format of collection letters have "overshadowed" the Notice. *See Chauncey v. JDR Recovery Corp.,* 118 F.3d 516, 518 (7th Cir. 1997) (citing cases holding that the G Notice may not be overshadowed from the Second, Third, Fourth, Seventh, and Ninth Circuits).

[34]If NCS had sent a G Notice, Mr. Carlisle may well have written a dispute letter to NCS requesting verification of the debt. Such a letter could have avoided the credit damage and emotional distress Mr. Carlisle suffered and led to a resolution of this matter by the informal dispute resolution mechanism which Congress provided rather than resulting in multi-party federal litigation. Thus, given the nature of the violation, Mr. Carlisle requests that the Court award $1,000.00 in statutory damages. *Florence v. National Sys*.

compensation for his emotional distress and mental anguish. RCDEC, ¶¶78-97; Declaration of Marissa Price, ¶¶4-9; Declaration of Edward Pannell,¶¶5-8. The GFBPA allows for a recovery "of general and exemplary damages sustained as a consequence . . . ." of violations of the Act. O.C.G.A. § 10-1-399(a). "General damages are those which the law presumes to flow from any tortious act . . . ." (Footnote omitted.) *Economic Exterminators of Savannah v. Wheeler,* 259 Ga. App. 192, 576 S.E.2d 601 (2003). "Wounding a man's feelings is as much actual damage as breaking his limbs." (Citations and punctuation omitted; emphasis in original.) *Fuqua Television v. Fleming*, 134 Ga. App. 731, 734 (3) (215 S.E.2d 694) (1975). "Injury to reputation is a personal injury, and personal injury damages can be recovered in a fraud action." *See Hamilton v. Powell, Goldstein, Frazer & Murphy*, 167 Ga. App. 411, 416 (2) (306 S.E.2d 340) (1983), *aff'd*, 252 Ga. 149 (311 S.E.2d 818) (1984).

In *Gilmore v. Account Management, Inc.* at *31-33. this Court held that general damages recoverable under the FBPA include damages for physical and mental distress and are not limited to economic or out of pocket expenses. *Gilmore* discussed *Regency Nissan, Inc. v. Taylor, 194 Ga. App. 645, 649, 391 S.E.2d 467, 472 (1990)* in which a car dealer had sold a the consumer a stolen vehicle. As *Gilmore* observed *Regency Nissan* sustained the award of general damages to the purchaser based, in part, on

38

"record evidence of aggravation suffered" by the consumer.[35]  Thus, *Gilmore* held that "damages for mental anguish are available under the FBPA."  *Id.* at *31-33.

In *Gilmore*, the consumer disputed bills sent to him by a home lawn service which claimed that it was owed for work after the consumer had canceled the contract. *Id.* at *2.  After the lawn service referred the account for collection, the collector sent the consumer demand letters and the consumer sent a letter to the collector disputing that any amount was owed. *Id.*  The collector ignored the dispute letter and continued its collection activities. *Gilmore* awarded the consumer $10,000.00 general damages because of the collectors numerous calls, letters, and threats of a lawsuit while the consumer was recovering from open heart surgery. *Id. at *33.*

Mr. Carlisle requests that he be awarded $12,500.00 in general damages due to his emotional distress and mental anguish caused by NCS's repeatedly reporting the incorrect amount of the debt and repeatedly failing to report the Thrifty debt as disputed. RCDEC, ¶97.  First, NCS was informed during the two phone calls with Mr. Carlisle on February 22, 2013 that Mr. Carlisle disputed the debt.  Secondly,  there is not doubt that when NCS received the first ACDV from Equifax (and all of the subsequent ACDV's) that it was informed that Mr. Carlisle disputed the debt.  The actions of

---

[35]In *Tiismann v. Linda Martin Homes Corp.*, 279 Ga. 137, 140 (Ga.2005), the Georgia Supreme Court cited *Regency Nissan's* formulation of "general damages" under the FBPA with approval.

Defendant NCS in reporting the debt without noting the dispute and misrepresenting the amount of the debt caused Mr. Carlisle emotional distress and mental anguish at a time he was looking for an apartment, needed to purchase a car and could not obtain a credit card.  RCDEC, ¶¶80-97. The emotional distress and mental anguish presented itself by causing Mr. Carlisle to lose sleep, lose his appetite and become moody and withdrawn. The distress Mr. Carlisle experienced and the continuing efforts to redress the situation wore on Mr. Carlisle to the extent that he became depressed.  In these circumstances, an award of $12,500.00 in general damages to Mr. Carlisle is fully justified.[36]  *Gilmore* at * 33.

### 3. <u>Treble Damages</u>

The FBPA provides, in pertinent part,  that "a court shall award three times actual damages for an intentional violation." O.C.G.A. § 10-1-399(c).  Under this provision a court shall award treble damages if the actions of the defendant are

---

[36]*Cf.  Boyce v. Attorney Dispatch Service, Inc.*, 1999 U.S. Dist. LEXIS 12970, *9 (S.D.OH. 1999), under the FDCPA the court awarded $10,000.00 in emotional and mental distress damages to consumers whom a debt collector threatened by phone with arrest on an NSF check after falsely identifying himself as  "Deputy Bell."; *Shoup v. Illiana Recovery Sys. , Inc.*, 2002 U.S. Dist. LEXIS 674 (W.D.Mich. 2002) (court awarded FDCPA actual damages totaling $53,000 against a repo company including $12,500.00 for mental anguish); *Goodin v. Bank of America,* 114 F.Supp.3d 1197 (M.D. Fla 2015) (After bench trial, actual damages of  $100,000.00 emotional and mental distress award to home owners who were current with their mortgage but bank filed foreclosure action anyway).

intentional.[37]   Since the actions of NCS were intentional, Mr. Carlisle requests that the Court treble the general damages and award a judgment in the amount of $37,500.00.

The actions of NCS in failing to report the debt as disputed and misrepresenting the amount of the debt were intentional. As discussed above, Mr. Carlisle's phone calls with NCS and the receipt of the ACDVs by NCS demonstrate its awareness of the disputed nature of the debt. Both after the phone calls and after the receipt of the ACDV, NCS ignored the dispute and intentionally reported the debt as undisputed demonstrating that its violations were intentional. *See Gilmore* at *34 (Collector who continued to report debt without noting dispute "intentionally" violated FBPA). Additionally, since NCS reported the debt as being in the $1,500.00 to 2,017.00 range but the tradeline was then reported as paid in full, it is clear that NCS intentionally reported an inaccurate amount. *Id.*  The actions of Defendant NCS in reporting the debt without noting the dispute and misrepresenting the amount of the debt caused Mr. Carlisle emotional distress and mental anguish as discussed above. The distress Mr. Carlisle experienced and the continuing efforts to redress the situation wore on Mr. Carlisle to the extent that he became depressed. For these reasons, Mr. Carlisle requests that the court treble the general damages of $12,500.00 and award treble damages of

---

[37]*Colonial Lincoln-Mercury Sales v. Molina,* 152 Ga. App. 379, 382, 262 S.E.2d 820) (1979); *accord Werner,* 288 Ga. App. at 461; *accord Givens v. Bourrie*, 190 Ga. App. 425, 379 S.E.2d 223 (1989).

$37,500.00.

Actual damages include out of pocket damages such as lost wages and physical injuries. Additionally, actual damages may be awarded for emotional distress where the actions of the debt collector have caused mental anguish and suffering, personal humiliation, and embarrassment.[38]  In *Gilmore v. Account Management, Inc.,*[39] the Magistrate Judge found that repeated collection contacts without identifying the caller as a collection agent, continuing to pursue collection after failing to verify the debt, deceptive actions, and communications which overshadowed the FDCPA's requirements caused the consumer $10,000.00 damages for emotional and mental distress including chest pains to the consumer who was recovering for open heart surgery. *Id.* *27-28.  The Magistrate Judge recommended awarding general damages of

---

[38]*Florence v. National Sys.*, 1983 U.S. Dist. LEXIS 20344, *12-13 (N.D.Ga. 1983): *Smith v. Law Offices of Mitchell N. Kay*, 124 B.R. 182 (D.Del. 1991);  *McGrady v. Nissan Motor Acceptance Corp.,* 40 F. Supp. 2d 1323, 1338 (M.D. Ala.1998);

[39]2009 U.S. Dist. LEXIS 79508, Mag. J. Rep. & Rec. (N.D.Ga. Apr., 27, 2009) *adopted, in part, rejected, in part* 2009 U.S. Dist. LEXIS 79321 (N.D.Ga. 2009) *aff'd in part, vac. in part,* 357 Fed. Appx. 218 (11th Cir. 2009) *on remand* 2010 U.S. Dist. LEXIS 79321 (N.D.Ga. June 11, 2010) (on remand District Court awarded $10,000.00 general damages under the FBPA and trebled the award to $30,000.00).

$10,000.00 under the FDCPA. *Id.*[40]

## D.  THE FAIR CREDIT REPORTING ACT

Credit is the lifeblood of the modern American economy.  The right to credit on a non-discriminatory basis is enshrined in the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*[41]  The consumer's ability to obtain credit is dependent on the accuracy of the information furnished to CRAs and inaccurate information may result in the consumer being denied credit or only being able to obtain credit at an inflated cost.

---

[40]  The Magistrate Judge recommended awarding $1,000.00 FDCPA statutory damages and general damages of $10,000.00 under the GFBPA. The District Court affirmed the award of statutory damages under the FDCPA but ruled that debt collectors were not covered under the Georgia Fair Business Practices Act. 2009 U.S. Dist. LEXIS 79321 *3-4. On appeal the Eleventh Circuit reversed the District Court and held that debt collection having an impact on the consumer market place was covered by the GFBPA.  On remand, the  District Court affirmed the Mag. Rep.&Rec. award of $10,000.00 and trebled the award to $30,000.00. *Id.*

[41]The ECOA statement of purpose states:

The Congress finds that there is a need to insure that the various financial institutions and other firms engaged in the extensions of credit *exercise their responsibility to make credit available with fairness, impartiality, and without discrimination on the basis of sex or marital status*. (Emphasis supplied).

Congressional findings and statement of purpose. Act Oct. 28, 1974, P.L. 93-495, Title V, § 502, 88 Stat. 1521.

In 1970, Congress enacted the Fair Credit Reporting Act ("FCRA"), 15 U.S.C.§§ 1681-1681x, "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy."[42] To achieve these goals, the Act sought to make "consumer reporting agencies exercise their grave responsibilities [in assembling and evaluating consumers' credit, and disseminating information about consumers' credit] with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

In addition, to ensure that credit reports are accurate, FCRA imposes duties on the entities that provide credit information to CRAs, which the statute refers to as "furnishers." Section 1681s-2a sets forth "[r]esponsibilities of furnishers of information to consumer reporting agencies," identifying two sets of responsibilities.  Subsection (a) details the duty "to provide accurate information," and includes the following duty:

(3) Duty to provide notice of dispute

If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is

---

[42]*Safeco Ins. Co. of Ant. v. Burr*, 551 U.S. 47, 127 S.Ct. 2201, 2205, 167 L. Ed. 2d 1045 (2007), *see also Harris v. Mexican Specialty Foods, Inc.,* 564 F.3d 1301, 1306 (11th Cir. 2009).

disputed by the consumer.

§ 1681s-2(a)(3).

Section 1681s-2(b) imposes additional duties on furnishers of information. These duties are triggered "upon [a] notice of dispute"-- that is, when a person who furnished information to a CRA receives notice from the CRA that the consumer disputes the information.[43] Subsection 1681s-2(b) provides that, after receiving a notice of dispute, the furnisher shall:

(A) conduct an investigation with respect to the disputed information.

(B) review all relevant information provided by the [CRA] pursuant to section 1681i(a)(2) . . . ;

(C) report the results of the investigation to the [CRA];

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information . . . ; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1) . . . (i) modify . . . (ii) delete [or] (iii) permanently

---

[43]See § 1681i(a)(2) (requiring CRAs promptly to provide such notification containing all relevant information about the consumer's dispute).

block the reporting of that item of information [to the CRAs].

The duty of a furnisher who receives notice of a consumer's dispute from a CRA was explicated in *Hinkle v. Midland Funding, LLC,* 827 F.3d 1295 (11th Cir. 2016) which stated:

> ... § 1681s-2(b) requires some degree of *careful inquiry* by furnishers of information. In particular, *when a furnisher does not already possess evidence establishing that an item of disputed information is true.[44]* (Emphasis supplied).

 FRCA imposes liability where a furnisher of credit information provides inaccurate information, either knowing or having reason to know the information to be inaccurate, or, after having "been notified by the consumer . . . that specific information is inaccurate; and . . . the information is, in fact, inaccurate." 15 U.S.C. § 1681s-2(a). Thus, a furnisher who receives a consumer's dispute via a CRA must reinvestigate to determine whether a report is inaccurate, incomplete or cannot be verified and in doing so should consider information provided by the CRA and also any information received from the consumer which sheds light on facts of the dispute. *Hinkle;  Gorman v.*

---

[44]*Accord, Johnson v. MBNA Am Bank,* 357 F.3d 426, 430-431 (4th Cir. 2003) ("plain meaning of "investigation" clearly requires some degree of careful inquiry by creditors"); *accord Saunders v. Branch Banking & Trust Co.,* 526 F.3d 142 (4th Cir. 2008); *Chiang v. Verizon New Eng. Inc.*, 595 F.3d 26, 36 (1st Cir. 2010); *Boggio v. USAA Fed. Sav. Bank,* 696 F.3d 611 (6th Cir. 2012).

*Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1158 (9th Cir. 2009). ("A disputed credit file that lacks a notation of dispute may well be "incomplete or inaccurate" within the meaning of the FCRA, and the furnisher has a privately enforceable obligation to correct the information after notice. § 1681s-2(b)(1)(D)).")

Under FCRA, the question also arises of whether or not a furnisher has the duty to report a debt as disputed in responding to a CRA inquiry if the consumer has directly disputed the debt with the furnisher.[45]  Because a furnisher's failure to report a bona fide dispute incorrectly imputes financial irresponsibility and because consumers could be pressured into paying a debt not due, *Saunders* ruled that the failure to report a debt as disputed renders the report "incomplete." *Saunders,* 526 F.3d at 150. The failure to report the debt as disputed also violates FCRA's policy to protect against "unfair credit reporting methods." *See 15 U.S.C. § 1681(a)(1).*  With these requirements  in mind let us turn to a discussion of whether the facts of this case show that Defendant NCS violated its duty to conduct a "reasonable" reinvestigation of the Thrifty Debt tradeline including to accurately reflect the debt as disputed.

**B.     NCS'S VIOLATIONS OF ITS DUTY TO
        CONDUCT A REASONABLE REINVESTIGATION**

---

[45]See discussion of a "debt collector's" duty to report a debt as disputed under the FDCPA, supra.

Mr. Carlisle disputed the accuracy of the NCS tradeline through a series of disputes with Equifax as well as making a dispute with TransUnion and Experian.  As discussed below, NCS never verified the accuracy of the Thrifty Debt in  investigating these disputes and its investigations were done in the most perfunctory manner.  Thus, under *Hinkle* which holds the FCRA's "framework reflects the fact that § 1681s-2(b) is designed not only to exclude false information from credit reports, but also to *prevent the reporting of unverifiable information*"[46]  Defendant NCS's conduct does not measure up to this standard.

### 1. Dispute of March 15, 2013

On March 15, 2013, Mr. Carlisle disputed the amount of the Thrifty obligation with Equifax. *See, Equifax ACDV of March 15, 2013, Ex. G, RCDEC.*  Equifax's ACDV requested that NCS provide the following information:

> **Dispute 1** [013] disputes current balance, *verify original loan amount,* scheduled monthly payment amount, actual payment amount, actual amount past due, *current balance*. (Emphasis supplied).

*Id.*  NCS responded to the ACDV that the tradeline was "verified as reported" but did not provide any of the underlying information requested by Equifax. *Id.*  Because the ACDV disputes the "current balance" and in light of Mr. Carlisle's previous dispute of

---

[46]*Hinkle.* at 1304.

48

the balance of the debt directly with NCS, NCS's response to Mr. Carlisle's dispute demonstrates that NCS did not undertake a reinvestigation that reasonably addressed the substance of the dispute. *See Gorman* at 1057 (Once the furnisher received an ACDV, the "pertinent question is . . . whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute"); *accord Boggio* at 619 (Furnisher's failure to review contract documents regarding Husband's  disputed joint liability with x-wife on car loan rendered its investigation arguably unreasonable).

The March 2013 Equifax ACDV informs NCS that Mr. Carlisle disputed the accuracy of the balance and that Equifax requested the original amount due, a payment history and the current balance.  Because NCS previously admitted to Mr. Carlisle that it did not have the Thrifty contract documents and because NCS did not provide the information requested by Equifax,  i.e., the original amount due, a payment history and the current balance, it is clear that NCS did not review the original transaction documents pertaining to the Thrifty rental.  If NCS had reviewed the transaction documents, it would have referred to the documents in its response to Equifax.[47]  Thus,

---

[47]The point is that 15 U.S.C. § 1681s-2(b)(C) requires that NCS report the results of the investigation to Equifax.  Thus, either NCS did not investigate the underlying documentation to determine the "original balance" requested or, if it did undertake such an investigation, it failed to report the results of such investigation to Equifax. *Cf. McKeown v. Sears Roebuck & Co.*, 335 F. Supp.

because NCS did not review the transaction documents, NCS conducted a perfunctory "investigation" without following proper procedures in ascertaining the original amount due, the payment history or current balance and, thus, its investigation was not reasonable. *Gorman; Saunders.*

When a consumer provides specific information contesting the accuracy of a previous report, merely verifying the previous report without investigating its accuracy is not a "reasonable" reinvestigation. *Johnson* at 430-431(When spouse disputed report that she was an obligor on husband's account, furnisher did not conduct a reasonable investigation by only looking at computer records and not viewing account documents); *accord Gorman* at 1057; *Boggio* at 619.   Because NCS did not review any of the underlying documents, its investigation of Mr. Carlisle's March 15, 2013 dispute with Equifax was not "reasonable."

### 2. Dispute of April 29, 2013

On April 29, 2013, Mr. Carlisle renewed his dispute of the NCS tradeline with Equifax.  Mr. Carlisle specifically provided the information that he had spoken with a supervisor at NCS who stated that NCS had no underlying documents. ACDV of 04/29/2013, Ex. J, RCDEC. Equifax characterized the dispute as:

---

2d 917(W.D.Wis. 2004) (furnisher violates FCRA by not conducting any investigation or conducting investigation it knows to be inadequate).

> **Dispute 1** [013] disputes current balance - verify original loan amount,
> scheduled monthly payment amount, actual payment amount, amount
> past due, current balance.

*Id.*   Once again NCS merely responded "Verified as Reported" but failed to substantively address the specific information requested by Equifax regarding the original loan amount or payments or reference a review of the underlying documents. Once again this perfunctory response does not reflect a reasonable "reinvestigation" which comports with the requirements of FCRA. *Johnson* at 430-431; *Gorman* at 1057; *Boggio* at 619.

### 3. Dispute of May 6, 2013

On May 6, 2013, Mr. Carlisle again disputed the NCS tradeline.   Equifax created an ACDV regarding the dispute that stated:

> **Dispute 1** [012] CLAIMS PAID THE ORIGINAL CREDITOR
> BEFORE COLLECTIONS STATUS OR PAID BEFORE THE
> CHARGE-OFF. VERIFY ACCOUNT STATUS, PAYMENT
> RATING, CURRENT BALANCE.

See Equifax ACDV of May 61, 2013, Ex. I, RCDEC.  NCS merely responded "Verified as Reported" but failed to substantively address the specific information requested by Equifax regarding the original loan amount or payments or reference a review of the

underlying documents. *Id.* Once again this perfunctory response is not a "reinvestigation" which comports with the requirements of FCRA. *Johnson* at 430-431; *Gorman* at 1057; *Boggio* at 619.

### 4. Dispute of May 6, 2013

On May 3, 2013, Mr. Carlisle sent Equifax another dispute which included a letter from Thrifty of August 10, 2012 which stated that $882.50 was owed and a letter from JNR Adjustment Company, Inc. attempting to collect the $882.50. See Equifax ACDV of May 6, 2013, Ex. L, RCDEC. Equifax characterized the dispute as:

> **Dispute 1** [013] disputes current balance - verify original loan amount, scheduled monthly payment amount, actual payment amount, amount past due, current balance.

*Id.* NCS merely responded "Verified as Reported" but failed to substantively address the specific information requested by Equifax regarding the original loan amount or payments or reference a review of the underlying documents. *Id.* Furthermore, NCS did not address the Letter for Thrifty stating that $880.05 was owed. Once again this perfunctory response is not a "reinvestigation" which comports with the requirements of FCRA. *Johnson* at 430-431; *Gorman* at 1057; *Boggio* at 619.

### 5. Dispute of May 8, 2013

On May 8, 2013, Equifax generated a new ACDV which again referenced the

JNR Letter stating:

> **FCRA RELEVANT INFORMATION** CONSUMER PROVIDED
> DOCUMENT FROM THRIFTY CAR RENTAL DATED 08 10 2012
> STATED THERE IS A BALANCE DUE OF DOLLAR 882 AND 5 SENT
> [sic] ON RENTAL CONTRACT OZ2076281

Ex. M, RCDEC.  Equifax again stated in the Dispute 1 box the same information regarding the consumer disputing the balance and requesting the account information requested in the May 6, 2013 ACDV.  NCS again responded "Verified as Reported" but failed to substantively address the specific information requested by Equifax regarding the original loan amount, payments and current balance or to reference any review of the underlying documents. *Id.*  Once again this perfunctory response is not a "reinvestigation" which comports with the requirements of FCRA. *Johnson* at 430-431; *Gorman* at 1057; *Boggio* at 619.

## 6. Mr. Carlisle's Discussions with Equifax During Dispute Process

On many occasions, Mr. Carlisle spoke with Equifax regarding the disputes he filed.  When Mr. Carlisle expressed dissatisfaction with NCS's response in several instances, Equifax's staff would suggest providing additional information or documents. Mr. Carlisle questioned why Equifax would not block the NCS tradeline until NCS provided the information regarding the original balance and payments that Equifax had

requested on the ACDV.  However, Mr. Carlisle was told by Equifax personnel that NCS would have to make the decision to change the report even though Equifax had not received the information it requested from NCS.  Mr. Carlisle became increasingly frustrated and upset over the series of disputes he had made to which NCS had not made a substantive response.  NCS's failure to conduct a reasonable investigation including the failure to verify the original account with Thrifty and the failure to provide Equifax with the information it sought regarding the account led to Equifax continuing to report the tradeline negatively impacting Mr. Carlisle's emotions and his ability to obtain credit.

### 7. CFBP Dispute of May 29, 2013

Mr. Carlisle became increasingly frustrated and angry because NCS's "knee jerk" response rendered his five disputes with Equifax ineffectual.  Finally, on May 29, 2013 Mr. Carlisle made a complaint to the Consumer Finance Protection Board ("CFPB) based on the JNR Letter stating that the balance owed to Thrifty was $882.50. ¶61, RCDEC. As a result of Mr. Carlisle's dispute to the CFPB, Equifax generated an ACDV of July 1, 2013 which stated that:

**FCRA RELEVANT INFORMATION** CFPB Complaint filed in which consumer has sent a copy of a Letter from Thrigty [sic] showing the amount owed should be $882.50

Ex. M, RCDEC.  Equifax again coded the Dispute 1 as "[013] DISPUTES CURRENT

BALANCE – VERIFY ORIGINAL LOAN AMOUNT, SCHEDULED MONTHLY

PAYMENT AMOUNT, ACTUAL PAYMENT AMOUNT, AMOUNT PAST DUE,

CURRENT BALANC [sic].  As a result of a conversation between a representative of

Equifax and the CFPB on July 31, 2013 and Equifax's further investigation with NCS,

the NCS tradeline was updated as "Credit Grantor shows paid in full."[48] ACRO

Maintenance Transaction Summary of  07/31/2013, p.3, a true and accurate copy of

which is attached hereto as Exhibit O.

 On July 31, 2013, the Thrifty tradeline was updated to report "This item had been paid

in full." EX. H, JCDEC. Ex. O, RCDEC.  Thus, only after Mr. Carlisle had made five

(5) disputes to Equifax which had been forwarded to NCS and all of which were

summarily "rubber-stamped" as "Verified" and a final dispute to the CFBP, was the

tradeline updated to read "paid in full."  Finally, as a result of a conversation between

a representative of Equifax and the CFPB on July 31, 2013 and Equifax's further

investigation with NCS, the NCS tradeline was updated as "Credit Grantor shows paid

in full." Acro Maintenance Transaction Summary For 07/31/2013, p.3, a true and

accurate copy of which is attached hereto as Exhibit O.

---

[48]On July 24, 2013, NCS had responded "VERIFIED] CORRECT AS
REPORTED."

Now let us consider Mr. Carlisle's claim for damages under FCRA.

## C. FCRA DAMAGES

FCRA permits the recovery of "actual damages" for negligent violation of the statute together with costs and attorney's fees. 15 U.S.C. § 1692o. FCRA permits the recovery of "actual damages" or statutory damages from $100.00 to $1,000.00 and such punitive damages as a court may allow for willful violations of the statute together with costs and attorney's fees. 15 U.S.C. § 1692n.  Mr. Carlisle will first discuss his claim for actual damages as a result of Defendant NCS's negligent violations of the Act.  Mr. Carlisle will next discuss his claim for actual and punitive damages as a result of NCS's willful violations of the Act.

### 1.   DAMAGES CAUSED BY NCS'S NEGLIGENT FCRA VIOLATIONS

A consumer may seek actual damages for out-of-pocket losses, damages for injury to reputation and creditworthiness and for humiliation or mental distress all of which may be awarded under 15 U.S.C. § 1681o for negligent violations of FCRA. *Kronstedt v. Equifax*, No. 01-C-52-C, 2001 U.S. Dist. LEXIS 25021, 2001 WL 34124783, *10 (W.D. Wis. Dec. 14,  2001) (citing *Cousin v. Trans Union Corp.*, 246 F.3d 359, 369 n. 15 (5th Cir. 2001), and *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995)).  The facts of this case establish that Mr. Carlisle has suffered

out-of-pocket losses, damages for injury to reputation and creditworthiness and for humiliation or mental distress caused by NCS's violations of FCRA.

### 1. EMOTIONAL DISTRESS DAMAGES

A consumer may recover damages for emotional distress caused by a furnisher's FCRA violations. Kronstedt v. *Equifax, CSC,* 2001 U.S. Dist. LEXIS 25021, 2001 WL 34214783, at \*11 (W.D. Wis. 2001). *See also Cousin*, 246 F.3d at 369 n. 15; *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995); *McKeown v. Sears Roebuck & Co.*, 335 F. Supp. 2d at 932.  Even if a consumer has experienced no credit denial or out of pocket losses, he may recover for emotional distress. *Moore v. Equifax Info. Servs. LLC*, 333 F. Supp. 2d 1360, 1365 (N.D. Ga. 2004) (Shoob, J.) (finding summary judgment was precluded based on Plaintiff's testimony that he suffered humiliation and embarrassment as a result of Equifax's inaccurate credit report).  In order to recover actual damages, a plaintiff must show that the violation of the statute caused the loss of credit or some other harm. *Crabill v. Trans Union, LLC,* 259 F.3d 662, 664 (7th Cir. 2001).  Actual damages for a FCRA violation may include humiliation and mental distress. *Casella v. Equifax Credit Info. Servs.,* 56 F.3d 469, 474 (2d Cir. 1995).  A wronged consumer's testimony alone may suffice to establish damages for emotional distress provided that she reasonably and sufficiently explains the circumstances surrounding the injury and does not rely on mere conclusory

statements. *United States v. Balistrieri*, 981 F.2d 916, 931-32 (7th Cir. 1992);  *Bach v. First Union Nat'l Bank*, 149 Fed. Appx. 354, 361 (6th Cir. 2005) (consumer's testimony alone sufficient); *accord Llwellyn v. Allstate Home Loans, Inc*. 711 F.3d 1173 (10th Cir. 2013) (no corroboration necessary).   A consumer may establish emotional harm by sufficiently detailed testimony which demonstrates the extent and nature of the distress caused by and associated with attempting to correct an erroneous CRA report. *Robinson v. Equifax Info. Servs*., LLC, 560 F.3d 235, 242 (4th Cir. 2009) (Award of $200,00.00 for emotional and mental distress damages together with aggravation of attempting to correct credit report); Miller v. Equifax Information Services, LLC, 3-11-CV-01231 (D. Or. January 29, 2014) (Award of $180,000.00 for emotional distress and injury to credit opportunities and reputation) *Bach,* 149 F. App'x at 361.

Mr. Carlisle has shown that NCS violated FCRA by failing numerous times to conduct a proper reinvestigation of the disputes Mr. Carlisle filed with the CRAs.  With respect to Equifax, on six different occasions, NCS did not conduct a proper reinvestigation.  Only when Mr. Carlisle disputed the debt through the CFPB was the reporting of the Thrifty tradeline changed to reflect that the debt " had been paid in full" by Equifax.  Furthermore each time NCS replied to Equifax, NCS failed to note that the account was disputed.

The actions of Defendant NCS in reporting the debt without noting the dispute

and failing to conduct a proper reinvestigation of Mr. Carlisle's disputes caused Mr. Carlisle emotional distress and mental anguish at a time he was looking for an apartment, needed to purchase a car and could not obtain a credit card. RCDEC, ¶¶ 80-,96; Declaration of Marissa Price, ¶¶ 6-10; Declaration of Edward Pannell, ¶¶ 8-11. Even if Mr. Carlisle's reduced circumstances were not caused by NCS's FCRA violations, consideration of Mr. Carlisle's circumstances in determining the impact that the FCRA violations on Mr. Carlisle is appropriate.

In *Bach v. First Union Nat'l Bank*, 149 Fed. Appx. 354 (6th Cir. 2005) *rev'd on other grounds Bach v. First Union Nat'l Bank,486* F.3d 150 (6th Cir. 2007), the Court considered whether a jury award of $400,000.00 for emotional distress was supported by the evidence. The Defendant Bank ("FUNB") falsely stated to a CRA that Bach was liable for an account surreptitiously opened by Bach's granddaughter. In assessing the sufficiency of Bach's testimony regarding her emotional and mental distress including the fact that around the time of the FCRA violations Bach had a stroke, the court stated that:

> Although the stroke was clearly not a result of FUNB's violation, the fact that Bach had suffered a stroke is pertinent to the circumstances surrounding Bach's emotional distress. As a result, Bach presented sufficient evidence from which the jury could reasonably conclude that

Bach was entitled to actual damages in the form of pain and suffering.

*Id.* at 359.

Given Mr. Carlisle's circumstances, the emotional harm caused by NCS's FCRA violations were amplified by his circumstances. Furthermore, the emotional distress and mental anguish evidenced itself by causing Mr. Carlisle to lose sleep, lose his appetite and become moody and withdrawn. The distress Mr. Carlisle experienced and the continuing efforts to redress the situation wore on Mr. Carlisle to the extent that he became depressed. Based on all these facts, Mr. Carlisle requests that the court award him $15,00.00 in damages for the emotional distress caused him by NCS.

Furthermore, *Saunders* noted that some CRAs did not include disputed debts in the consumer's credit score.

### 2.   Damages for Willful Violation of FCRA

Under 15 U.S.C. § 1681n(a), a consumer need not prove actual damages if the violation is willful, but may recover punitive damages and statutory damages ranging from "$100 to $1,000" for each violation of FCRA. *Birmingham v. Experian Info. Solutions, Inc.*, 633 F.3d 1006, 1009 (10th Cir. 2011).

To recover for a willful violation, a consumer must show either an intentional violation or a violation committed in reckless disregard of its duties under FCRA.

*Birmingham*, 633 F.3d at 1010.  "Recklessness is measured by 'an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id.* (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007)).  "'[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but  shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.'" Id. (quoting *Safeco*, 551 U.S. at 69) (alterations in original).

A furnisher of information may be held liable for punitive damages where it knowingly and intentionally choose to report a debt without reporting an ongoing dispute. *Saunders* at 151.  Also an allegation that a furnisher has repeatedly failed  to conduct a reasonable investigation alleges a willful violation of 15 USC 1681s-2(b). *King v. Bank of Am., N.A.*,2012 U.S. Dist. LEXIS 141963 at *6 (N.D. Cal.Oct. 1, 2012).

Under the facts of this case, Mr. Carlisle has shown that NCS  over a five month period repeatedly reported the Thrifty tradeline without noting that the debt was disputed.  Furthermore, NCS did not note that the debt was disputed after receiving the ACDV's generated by Equifax in response to Mr. Carlisle's disputes.  These facts establish that NCS either acted intentionally or with reckless disregard for its duty to report the debt as disputed.  Additionally, NCS failed to conduct a reasonable

investigations of the ACDVs.  These facts establish that NCS willfully violated FCRA entitling Mr. Carlisle to actual and punitive damages.  Mr. Carlisle requests that the court award actual damages of $75,000.00 in punitive damages. *See Saunders* at 151 (Punitive damages proper where furnisher whose records reflects dispute intentionally fails to report that debt as disputed).  Plaintiff does not have any direct evidence of Defendant NCS's financial standing.  However as some evidence of NCS's financial well being Plaintiff direct's the court to its website --https://ncssubro.com/ (last visited December 16, 2016) which states:

> National Commercial Services is an experienced and specialized Subrogation & Commercial Collection Agency located in the San Fernando Valley. We have been representing top-tier insurance companies and business enterprises throughout the nation with our knowledgeable expertise in all aspects of subrogation and commercial matters for over 20 years. As members of the National List of Attorneys and Gold Sponsors of the National Association of Subrogation Professionals, *we are nationally licensed and bonded.*  (Emphasis Supplied).

## CONCLUSION

Defendant National Commercial Services, Inc. has committed multiple violations

of the Fair Debt Collection Practices Act.  In the first instance, Defendant NCS failed to send Plaintiff Roland Carlisle the G Notice required by 15 U.S.C. § 1692g(a) informing him of his consumer rights including his right to dispute the debt.  The delivery of the G Notice would have simplified Plaintiff Carlisle's year long ordeal in pursuing the more complex dispute mechanism under the Fair Credit Reporting Act. Secondly, Defendant NCS failed to recognize and act on Mr. Carlisle's multiple disputes of the debt.  An careful collection agency would realize that when it receives a nonfrivolous FCRA dispute from a CRA that it must thereafter report the debt as disputed. This miscue led NCS to fail to properly report the tradeline at issue to the CRA's as disputed thereby violating 15 U.S.C. § 1692e(8).  Finally, given the multiple amounts requested by Thrifty, Defendant NCS misstated the amount of the debt. *Hepsen v.. Resurgent Capital Servs, LP, supra,* in violation of 15 U.S.C. § 1692e(2)(A). Defendant is liable for statutory damages for its violations of the FDCPA and Plaintiff seeks the maximum of $1,000.00. 15 U.S.C. § 1692k(a)(1).  Because of the number and severity of the FDCPA violations, the court should award statutory damages of $1,000.00.

Because Defendant violated the FDCPA, it necessarily also violated the Georgia Fair Business Practices Act. *Gilmore v. Account Management, Inc., supra*.  The GFBPA permits the recovery of "general damages" including emotional distress. Given the

emotional damages and hardship experienced by Mr. Carlisle, Mr. Carlisle seeks $12,500.00 in general damages to compensate him for the inconvenience and distress caused him by Defendant's actions.  Pursuant to O.C.G.A. 10-1-399(c), Mr. Carlisle requests that because Defendants actions were willful and intention that the Court grant Mr. Carlisle treble damages of $37,500.00.

Defendant NCS failed to live up to its r]esponsibilities as a "furnisher" of information under the Fair Credit Reporting Act to make a "reasonable investigation" when Mr. Carlisle disputed the debt at issue. As the recent case of Hinkle v. Midland Funding, LLC elucidates the burden of investigation may be heavier on a 3d party debt buyer and by implication on a debt collector than on the original creditor.  Where the furnisher does not have the original information pertaining to a debt then it must take reasonable steps to ascertain what are the facts giving rise to the dispute. Seemingly NCS only took the perfunctory step of consulting its only abridge records and then proceeded to rubber stamp each dispute as "verified as reported."  Under Hinkle and other relevant case law, a furnisher must make a sufficient inquiry to determine the facts and if it is unable to determine what the facts are then it must report that it cannot verify the debt.  NCS did not meet this duty and inexplicably began re-reporting the debt after Mr. Carlisle had been successful in disputing the debt with Equifax and the CFPB.

Mr. Carlisle has stated the particulars as to why he was cut off from credit and

suffered emotional distress as a result of Defendant's actions in failing to conduct a proper investigation of the debt it claimed was owed.  Mr. Carlisle has buttressed his claim for emotional distress damages by the Price Declaration and the Pannell Declaration which flesh out Mr. Carlisle's circumstances and provide additional support and credibility to his claim.  Based on the circumstances, Mr. Carlisle requests that the Court award him $12,500.00 in damages for the impairment to his credit and the emotional distress and mental strain caused by Defendant's actions.

Plaintiff urges also that this is an appropriate case for an award of punitive damages.  Defendant repeatedly refused over a six month period to conduct a meaningful investigation into  the circumstances of the validity of the debt.  Most strikingly Defendant sought to revive placing the debt on Mr. Carlisle's credit file after the CFPB had sustained Mr. Carlisle's dispute.  These actions are willful and malicious and support an award of $75,000.00 in punitive damages to deter such conduct in the future.

In summary Plaintiff request that the Court award him $1,000.00 in statutory damages under the FDCPA, award him general damages under the GFBPA of $12,500.00 and treble that amount to $37,500.00, and award $12,500 damages under the

FCRA and punitive damages of $75,000.00 for a total award of $116,500.00.


Respectfully Submitted,

S/Dwight Bowen
Dwight Bowen
Georgia Bar Number 071150
Attorney for Plaintiff
235 Peachtree Street, N.E., Suite 400
Atlanta, Georgia 30303
(404) 880-3310
(404) 880-3332 (fax)
Email: Dbowen9@aol.com

## <u>CERTIFICATION OF COMPLIANCE AS TO FONT SIZE</u>

The undersigned counsel certifies that the foregoing Request has been prepared with 14 point Times New Roman font, which is one of the fonts and point selections approved by the Court in Local Rule 5.1B.

<u>S/Dwight Bowen</u>
Dwight Bowen

## CERTIFICATE OF SERVICE

This is to certify that I have electronically filed the foregoing pleading with the clerk of the court using the CM/ECF system which will automatically send e-mail notification to the following counsel of record:

Nicole M. Strickler, Esq.
strickleramesserstilp.com

John Bedard, Esq.
jbedard@bedardlawgroup.com

This 23<u>rd</u> day of December, 2016.


<u>S/Dwight Bowen</u>
Dwight Bowen