IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROLAND CARLISLE,

     Plaintiff,

v.

                        CIVIL ACTION NO.
                        1:14-CV-515-TWT-LTW

NATIONAL COMMERCIAL
SERVICES, INC.,

     Defendant.

## MAGISTRATE JUDGE'S FINAL ORDER AND REPORT AND RECOMMENDATION

This action is presently before the Court on Plaintiff Roland Carlisle's Motion for Default Judgment Against Defendant National Commercial Services, Inc. (Doc. 83), Defendant's Motion to Strike Plaintiff's Memorandum of Law in Support of Motion for Default Judgment (Doc. 86), and Plaintiff's Motion to Permit Filing of Brief in Excess of Twenty-Five Pages and to Permit Supplementary Filing of Declarations (Doc. 88). For the reasons set forth below, Defendant's Motion to Strike is **DENIED** (Doc. 86) and Plaintiff's Motion to Permit Filing of Brief in Excess of Twenty-Five Pages and to Permit Supplementary Filing of Declarations is **GRANTED** (Doc. 88). This Court **RECOMMENDS** that Plaintiff's Motion for Default Judgment should be **GRANTED IN PART**. (Doc. 83).

**DEFENDANT'S MOTION TO STRIKE AND PLAINTIFF'S MOTION TO PERMIT FILING OF BRIEF IN EXCESS OF TWENTY-FIVE PAGES AND TO PERMIT SUPPLEMENTARY FILING OF DECLARATIONS**

In Defendant National Commercial Services, Inc.'s ("Defendant" or "NCS") Motion to Strike Plaintiff's Memorandum of Law in Support of Motion for Default Judgment (Doc. 86), NCS contends that Plaintiff's Memorandum should be stricken because it exceeds the page limitation set forth in the local rules. In response, Plaintiff filed his Motion to Permit Filing of Brief in Excess of Twenty-Five Pages and to Permit Supplementary Filing of Declarations and Response to Defendant's Motion to Strike. (Doc. 88). Plaintiff contends therein that the Court should grant him leave to file his brief in excess of twenty-five pages because the excess pages are needed to address his various claims as well as the lengthy history leading to NCS's violations of multiple statutes and his injuries. Local Rule 7.1D requires that absent prior permission of the Court, briefs filed in support of a motion are limited in length to twenty-five pages. LR 7.1D, NDGa. It is in this Court's discretion to permit a party to exceed the page limitation. Id. The Court finds that it is appropriate to exercise discretion here because while Plaintiff's brief is lengthy, it is lengthy because Plaintiff included more in-depth facts and more nuanced law. In this case, Plaintiff's over-inclusiveness will not cause any additional strain on Court resources. Additionally, it does not appear to have caused any strain on NCS, as NCS was able to confine its response brief to fifteen pages. Accordingly, NCS's Motion to Strike Plaintiff's Brief is **DENIED**. (Doc. Doc. 86). Plaintiff's Motion to Permit Filing of Brief in Excess of Twenty-Five Pages is

AO 72A
(Rev.8/82)

**GRANTED**.  (Doc. 88).

NCS further contends that the Declarations Plaintiff offers in support of his Motion should also be stricken because the Declarations, which contain electronic signatures, do not comply with the local rules' requirement that the filing party shall scan the original document and then electronically file it.  In response, however, Plaintiff has electronically filed scans of the signed Declarations.  (Doc. 88, at 11-45).  Thus, NCS's Motion to Strike the Declarations is **DENIED** (Doc. 86, at 3) and Plaintiff's Motion to Permit Supplementary Filing of Declarations is **GRANTED** (Doc. 88).

## PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

## I.   BACKGROUND

On February 21, 2014, Plaintiff filed his Complaint in this Court, and subsequently amended his Complaint on May 16, 2014.  (Docket Entries 1, 6).  In Plaintiff's Amended Complaint, Plaintiff contends that NCS violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA"), the Fair Credit Reporting Act 15 U.S.C. § 1681 et seq. ("FCRA"), and the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390 et seq. ("GFBPA").  Plaintiff avers that NCS is a California corporation whose principle business is the collection of debts from consumers and as such, NCS regularly furnishes information to one or more consumer reporting agencies including Defendants Experian Information Solutions, Inc. ("Experian"), Trans Union, LLC ("Trans Union"), and Equifax Information Services, LLC ("Equifax").  (Am.

3

Compl. ¶ 5).

The origin of the conflict between Plaintiff and Defendants is a dispute Plaintiff had with Thrifty Car Rental ("Thrifty"). Plaintiff states that on July 15, 2012, he rented a car from Thrifty and paid a deposit of $350.00. (Am. Compl. ¶ 9). Law enforcement officers stopped Plaintiff while he was driving the vehicle, and impounded it. (Am. Compl. ¶ 10). On July 20, 2012, Thrifty provided Plaintiff with a rental summary indicating that the $350.00 rental deposit had been applied and a zero balance remained. (Am. Compl. ¶¶ 11-12). Thrifty subsequently billed Plaintiff for $1,017.41 on August 8, 2012, $882.50 on August 10, 2012, and $1,782.61 on August 15, 2012. (Am. Compl. ¶¶ 9-14).

On September 25, 2012, Plaintiff received a collection letter from JNR Adjustment, Inc. indicating that he owed $882.50 to DTAG Rental. (Am. Compl. ¶ 17). Plaintiff disputed the debt. (Am. Compl. ¶ 17). In November 2012, Thrifty referred Plaintiff's debt to NCS for collection. (Am. Compl. ¶ 19). On February 22, 2013, NCS left Plaintiff a voicemail, and Plaintiff telephoned NCS, spoke with an NCS representative, and disputed the debt. (Am. Compl. ¶¶ 19-20). In March 2013, Plaintiff again called NCS and again informed a NCS representative that he disputed the debt. (Am. Compl. ¶¶ 19-20). The NCS representative advised Plaintiff that there was no information in the file concerning the debt, but that NCS would obtain the information from Thrifty and return his call. (Am. Compl. ¶ 22). Plaintiff states that NCS nevertheless reported to Experian that he owed $1,892.00 and that the payment status

AO 72A
(Rev.8/82)

was seriously past due; reported to Equifax that he owed $1,892.00 and that the status was unpaid; and reported to Trans Union that he owed $1,892.00, but that the payment status was "charged off to bad debt." (Am. Compl. ¶¶ 24-26). NCS did not report to any of the consumer reporting agencies that Plaintiff had disputed the debt. (Am. Compl. ¶¶ 24-26). When Plaintiff contacted Equifax to dispute the accuracy of NCS's information and requested that Equifax investigate, Equifax ultimately reported to Plaintiff that NCS had verified to Equifax that the balance owed was being reported correctly. (Am. Compl. ¶ 29). When Plaintiff challenged the accuracy of NCS's reporting with Experian, Experian acknowledged his dispute letter, but did not ever advise him as to the results of the investigation of the accuracy of NCS's report. (Am. Compl. ¶ 34). When Plaintiff notified Trans Union that he disputed the debt, Trans Union reported the substance of the dispute to NCS and requested that NCS investigate the matter. (Am. Compl. ¶ 35). Trans Union ultimately advised Plaintiff that the investigation results were complete and the results were "VERIFIED, NO CHANGE." (Am. Compl. ¶ 37). Trans Union also enclosed a copy of the NCS tradeline listing the balance owed Thrifty as $2,071 and that the debt was not disputed. (Am. Compl. ¶ 38).

Plaintiff contends that NCS violated (1) Section 1692g(a) of the FDCPA when NCS failed to provide proper written notice within five days of the initial communication; (2) Section 1692e(2)(A) when NCS falsely represented the amount and legal character of the debt; and (3) Section 1692e(8) when NCS failed to report to Trans Union, Equifax, and Experian that Plaintiff disputed the debt. (Am. Compl. ¶ 45).

Plaintiff also contends that NCS violated the FCRA when NCS failed to properly investigate his dispute of the debt, failed to accurately respond to verification requests by Equifax and Trans Union, failed to accurately report results of an accurate investigation to other reporting agencies, and failed to correct its own internal records to prevent the re-reporting of incorrect information to consumer reporting agencies. (Am. Compl. ¶ 78). Finally, Plaintiff contends that NCS's violations of the FDCPA and the FCRA were also violations of the GFBPA. (Am. Compl. ¶ 83).

## II.   LEGAL ANALYSIS

### A.   Default Judgment Standard

The entry of a default judgment is appropriate when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend and that fact is made to appear by affidavit or otherwise. Fed. R. Civ. P. 55(b); Dawkins v. Glover, 308 F. App'x 394, 395 (11th Cir. 2009). A party's failure to appear and the Clerk's subsequent entry of default does not in itself warrant the court's entry of a default judgment. Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975); GMAC Commercial Mortg. Corp. v. Maitland Hotel Assocs., Ltd., 218 F. Supp. 2d 1355, 1359 (M.D. Fla. 2002). Before entering a default judgment for damages, the district court must ensure that the well-pleaded allegations in the complaint, which are taken as true due to the default, actually state a substantive cause of action and that there is a substantive, sufficient basis in the pleadings for the particular relief sought. Cotton v. Mass. Mut. Life Ins. Co., 402 F.3d 1267, 1278 (11th

6

Cir. 2005) (holding that the defendant, even though in default, is still entitled to contest the sufficiency of the complaint and its allegations to support the judgment being sought). A defaulted defendant is deemed to admit "the plaintiff's well-pleaded allegations of fact," but should not admit facts that are not well-pleaded or conclusions of law. Nishimatsu Constr. Co., 515 F.2d at 1206; see also Johnson v. Rammage, No. 5:06-CV-057 (CAR), 2007 WL 2276847, at *1 (M.D. Ga. Aug. 7, 2007) (explaining that when considering a motion for default judgment, a court must examine "whether the unchallenged facts constitute a legitimate cause of action, since the party in default does not admit a mere conclusion of law"). When considering the propriety of entering a default judgment, the court also must consider jurisdiction and damages. Pitts ex rel. Pitts v. Seneca Sports, Inc., 321 F. Supp. 2d 1353, 1356 (S.D. Ga. 2004). The Court may also consider evidence presented at a hearing on the motion for default judgment or other evidence in the record. Fed. R. Civ. P. 55(b)(2)(C)

Under Rule 55(b)(2), when a district court enters a default judgment, the court may conduct hearings when, in order to enter or effectuate judgment, it needs to determine the amount of damages. Giovanno v. Fabec, 804 F.3d 1361, 1366 (11th Cir. 2015). Rule 55(b)(2) does not require a damages hearing in every case. Id. The district court may forgo a hearing when all of the essential evidence is already of record. Id. Additionally, the hearing does not have to consist of oral testimony. "Rather, the 'hearing' may be one in which the [court] asks the parties to submit affidavits and other materials from which the court can decide the issue." 10 James Wm. Moore et al.,

7

Moore's Federal Practice ¶ 55.32 (3d ed. 2016); see also First Cmty. Bank v. M/V Miss Anna, No. 16-0403-WS-B, 2016 WL 7319687, at *4 n.5 (S.D. Ala. Dec. 15, 2016); FCC Equip. Fin. v. Sumrall, No. 1:15-CV-00044 (LJA), 2015 WL 5003557, at *4 (M.D. Ga. Aug. 21, 2015) ("As a general rule, the court may enter a default judgment awarding damages without a hearing only if the amount of damages is a liquidated sum, an amount capable of mathematical calculation, or an amount demonstrated by detailed affidavits."). In this case, an in-court hearing is unnecessary because the parties have had an opportunity to present evidence in support of their damages arguments and neither party has requested an in-court hearing.

> ### B.   Jurisdiction

For a default judgment to be valid, the court must also have personal and subject matter jurisdiction over the defendant. Rash v. Rash, 173 F.3d 1376, 1381 (11th Cir. 1999). Thus, "[w]hen entry of default is sought against a party who has failed to plead or otherwise defend, the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties." Sys. Pipe & Supply, Inc. v. M/V Viktor Kurnatovskiy, 242 F.3d 322, 324 (5th Cir. 2001) (noting that it is proper for the Court to make inquiry into personal jurisdiction over the parties sua sponte); Rumero v. All Stars Direct Servs., LLC, No. Civ. A. 6:08-CV-257-Orl-18DAB, 2008 WL 2686751, at *1 (M.D. Fla. June 27, 2008). In the present case, the Court clearly has subject matter jurisdiction exists over Plaintiff's FDCPA and FCRA claims because they are federal claims. 15 U.S.C. § 1692k(d); 28 U.S.C. § 1331. Likewise, the Court has supplemental

8

jurisdiction over Plaintiff's state law GFBPA claim because it relies upon the same facts and the same legal theory as Plaintiff's federal claims.  28 U.S.C. § 1367(a).

The undersigned must therefore determine whether the Court retains personal jurisdiction over NCS.  See Sys. Pipe, 242 F.3d at 324 (finding no error when district court inquired into personal jurisdiction over parties *sua sponte* before rendering entry of default judgment).  A federal court's exercise of personal jurisdiction over a defendant requires satisfaction of the procedural requirements of service of summons and a determination of whether the relationship between the defendant and the forum is constitutionally sufficient.  Brink's Mat Ltd. v. Diamond, 906 F.2d 1519, 1521 (11th Cir. 1990).  This Court already determined that NCS waived any objection it had to service of process in the Report and Recommendation dated June 2015, and the District Court adopted this Court's Report and Recommendation on July 7, 2015.

Likewise, NCS has waived any objections that it may have to remaining requirements for personal jurisdiction.  Personal jurisdiction over a nonresident defendant exists when both parts of a two-part analysis are satisfied.  Abramson v. Walt Disney World Co., 132 F. App'x 273, 275 (11th Cir. 2005); Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990).  First, the forum state's long arm statute must provide a basis for jurisdiction.  Abramson, 132 F. App'x at 275; Madara, 916 F.2d at 1514.  State law governs whether the state's long arm statute reaches the controversy in question.  Abramson, 132 F. App'x at 275; Madara, 916 F.2d at 1514.  Second, there must be sufficient minimum contacts to satisfy due process constitutional concerns.  Abramson,

AO 72A
(Rev.8/82)

132 F. App'x at 275; <u>Madara</u>, 916 F.2d at 1514. Here, again, NCS waived any objections as to these requirements for personal jurisdiction when NCS did not object to personal jurisdiction in its Motion to Vacate Default. (Doc. 38). <u>In re Worldwide Web Sys.</u>, 328 F.3d 1291, 1299 (11th Cir. 2003) (explaining that "objections to personal jurisdiction (unlike subject matter jurisdiction) are generally waivable" when they are not raised when initially asserting a challenge to default judgment). Although NCS appeared in the case at that time, NCS has never objected to personal jurisdiction.

  **C.** <u>**Liability**</u>

    1. <u>FDCPA Violations</u>

  Plaintiff contends that NCS violated (1) Section 1692g(a) of the FDCPA when NCS failed to provide the written notice required by Section 1692g(a) within five days of the initial communication; (2) Section 1692e(2)(A) when NCS falsely represented the amount and legal character of the debt; and (3) Section 1692e(8) when NCS failed to notify Trans Union, Equifax, and Experian that Plaintiff disputed the debt. (Am. Compl. ¶ 45). The facts of Plaintiff's Amended Complaint state claims for violation of the FDCPA. Notably, the FDCPA was passed in 1977 in order to protect consumers from unfair debt collection practices. 15 U.S.C. § 1692(e) ("It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors . . . [and] to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged . . . ."); <u>Acosta v. Campbell</u>, 309 F. App'x 315, 320 (11th Cir. 2009). The Act's prohibitions on improper collection methods only apply to

debt collectors. The FDCPA generally precludes "'*debt collectors*' from making false or misleading representations and from engaging in various abusive and unfair practices." <u>Acosta</u>, 309 F. App'x at 320; <u>see also</u> <u>Heintz v. Jenkins</u>, 514 U.S. 291 (1995).

Thus, in order to state a FDCPA claim, a plaintiff must plausibly allege that (1) the defendant is a debt collector; (2) the challenged conduct is related to debt collection; and (3) the defendant has engaged in an act or omission prohibited by the FDCPA. <u>Reese v. Ellis, Painter, Ratterree & Adams</u>, 678 F.3d 1211, 1216, 1218 (11th Cir. 2012) (explaining that "in order to state a plausible FDCPA claim under Section 1692e, a plaintiff must allege, among other things . . . that the defendant is a debt collector"); <u>see also</u> <u>Goia v. CitiFinancial Auto</u>, 499 F. App'x 930, 938 (11th Cir. 2012); <u>Frazier v. Absolute Collection Serv.</u>, 767 F. Supp. 2d 1354, 1362-63 (N.D. Ga. 2011).

First, this Court is satisfied, based on judicially noticed facts, that NCS is a debt collector. The Act generally defines the term "debt collector" as "any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be *owed or due another*." 15 U.S.C. § 1692a(6). While the allegations in the Complaint fall short of showing that NCS is a debt-collector because they are too conclusory and formulaic, this Court takes judicial notice of NCS's website which includes facts showing that NCS regularly attempts to collect debts owed to others. Therein, NCS informs potential clients that it "is an experienced and specialized Subrogation & Commercial Collection

Agency," and that "NCS knows that the sooner we make contact with the tortfeasor or debtor . . . the sooner your money is recovered. . . . This is our single focus, and NCS has done it extremely well for twenty years." <u>See</u> NCS, https://ncssubro.com/about-us.html (last visited Feb. 9, 2017); NCS, https://ncssubro.com/index-2.html (last visited Feb. 9, 2017). Under these circumstances, it is plausible that NCS regularly collects or attempts to collect debts owed another, and therefore, is a debt collector.

Likewise, it is also plausible that NCS was engaging in debt collection activity. A debt collector engages in debt collection activity when it demands payment of the debt. <u>See</u> <u>Reese</u>, 678 F.3d at 1217. Here, it is plausible that NCS engaged in such activity when after Thrifty referred the debt to NCS for collection, a NCS representative contacted Plaintiff and the debt was discussed during subsequent phone calls. (Am. Compl. ¶¶ 19-23). As discussed below, it is also plausible that NCS's collection activities violated the FDCPA.

a.    <u>Plaintiff's Section 1692g Claim</u>

Plaintiff contends that NCS violated the FDCPA because NCS did not send him the written notice required by Section 1692g(a) of the FDCPA, and in fact, never sent him anything in writing. (Am. Compl. ¶¶ 20-23, 45). Section 1692g(a) requires that within five days after the initial communication with a consumer, the debt collector must provide the consumer with a written notice, sometimes referred to as the validation notice, containing the amount of the debt, the name of the creditor to whom the debt is

owed, a statement that unless the consumer disputes the debt within thirty days of receipt of the notice, the debt will be assumed to be valid, that if the consumer notifies the debt collector in writing within the thirty day period that the debt is disputed, the debt collector will obtain verification of the debt, and a statement that upon the consumer's written request within the thirty day period that the debt collector will provide the consumer with the name and address of the original creditor if the original creditor is not the current creditor.  15 U.S.C. § 1692g(a); <u>Caceres v. McCalla Raymer, LLC</u>, 755 F.3d 1299, 1301 (11th Cir. 2014).  The Act defines communication as "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2).  Thus, the term "initial communication" has been interpreted in this circuit as encompassing telephonic communications.  <u>Ponce v. BCA Fin. Servs., Inc.</u>, 467 F. App'x 806, 807 (11th Cir. 2012); <u>Franklin v. Dean</u>, No. 2:11CV683-WKW, 2013 WL 806151, at *4 (M.D. Ala. Jan. 31, 2013).  Plaintiff thus contends that NCS should have sent it the validation notice required by Section 1692g within five days of NCS's initial phone discussion with Plaintiff in February 2013, but NCS never sent any notices to Plaintiff.  (Am. Compl. ¶¶ 19-23, 45).  Based on the allegations in the Amended Complaint, it is plausible that NCS failed to send the notice required by Section 1692g.

b.     <u>Violation of Section 1692e(2)(A) of the FDCPA</u>

Plaintiff further contends that NCS violated Section 1692e(2)(A) of the FDCPA when it falsely represented the amount and legal character of the debt.  (Am. Compl. ¶

13

45).  Specifically, Plaintiff contends that NCS falsely represented the amount and legal character of the debt because Thrifty had advised him that he had a zero balance, but subsequently sent him multiple bills showing not only that he still owed money, but also that the amounts billed by Thrifty were inconsistent.  Thus, Plaintiff argues the amount that NCS stated that he owed was also not correct.  (Am. Compl. ¶¶ 11-23, 45).  Based on the allegations in the Complaint, it is plausible that NCS's actions violated Section 1692e.  A debt collector is liable under Section 1692e(2) of the FDCPA if it falsely represents the character, amount, or legal status of a debt.  15 U.S.C. § 1692e(2).  That means that when the debt collector attempts to collect the debt, it must state the correct amount of the debt.  15 U.S.C. § 1692e(2)(A).  When the collector incorrectly states the amount of the debt, it violates Section 1692e(2)(A).  Hepsen v. J.C. Christensen & Assoc., No. 8:07CV1935, 2009 WL 3064865, at *5 (M.D. Fla. Sep. 22, 2009) (when the collector incorrectly states the amount of debt it violates 15 U.S.C. § 1692e(2)(A)); Taylor v. Heath W. Williams, LLC, 510 F. Supp. 2d 1206, 1211 (N.D. Ga. 2007) (misrepresentation that amount of judgment violated FDCPA); Williams v. Edelman, 408 F. Supp. 2d 1261, 1269 (S.D. Fla 2005) (denying motion to dismiss claim that defendants misrepresented amount of debt when they asserted that plaintiff owed a debt that she did not owe); Berndt v. Fairfield Resorts, Inc., 337 F. Supp. 2d 1120, 1131 (W.D. Wis. 2004) (defendant which sent letters incorrectly asserting that Plaintiff owed debt violated 15 U.S.C. § 1692e(2)(A)).

Here, based on the allegations in the Amended Complaint, it is plausible that NCS

14

violated Section 1692e(2)(A).  According to Plaintiff, Thrifty provided him with a receipt reflecting that the account had a zero balance after applying the rental deposit. (Am. Compl. ¶ 11, Ex. A).  Nevertheless, NCS's representative sought $1,782.00 from Plaintiff, just after the prior collector had only sought $882.50 two months before. (Am. Compl. ¶¶ 11, 17-26).  NCS also reported to the consumer reporting agencies that Plaintiff owed $1,892.00.  (Pl.'s Decl. ¶ 24; Am. Compl. ¶¶ 19-26).  Under these circumstances, it is plausible that NCS repeatedly sought different sums from Plaintiff in connection with the Thrifty debt even though Plaintiff had already paid the balance in full and that as a result, NCS violated Section 1692e(2)(A).

c.    <u>Violation of Section 1692e(8)</u>

Plaintiff contends in his Motion for Default Judgment that NCS violated Section 1692e(8) when it negatively reported the debt to Equifax, Experian, and Trans Union on multiple occasions without also reporting that the debt was disputed.  Section 1692e(8) of the FDCPA is violated when the debt collector "communicates or threatens to communicate to any person's credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8); <u>Gilmore v. Account Mgmt.</u>, No. 1:08-CV-1388-JOF-LTW, 2009 WL 2848278, at *6 (N.D. Ga. Apr. 27, 2009).  In this case, Plaintiff alleges that he verbally disputed the debt when he was on the phone with NCS representatives, but NCS reported his alleged debt as delinquent to consumer reporting agencies without also reporting that Plaintiff disputed the debt.  (Am. Compl. ¶¶ 20-21, 24-26).  Plaintiff

15

argues his verbal dispute of the debt triggers NCS's obligation to communicate that the debt is disputed when communicating his credit information. This Court agrees. The plain language of Section 1692e(8) requires debt collectors to communicate the disputed status of a debt if the debt collector knows or should know that the debt is disputed. 15 U.S.C. § 1692e(8); White v. Bank of Am. Bank, NA, 597 F. App'x 1015, 1020-21 (11th Cir. 2014); Brady v. Credit Recovery Co., 160 F.3d 64, 67 (1st Cir. 1998). "This 'knows or should know' standard requires no notification by the consumer, written or oral, and instead, depends solely on the debt collector's knowledge that a debt is disputed, regardless of how that knowledge is acquired." Brady, 160 F.3d at 67. Thus, there is no requirement that the Plaintiff communicate the dispute in writing. Id.; see also Russell v. Absolute Collection Servs., 763 F.3d 385, 395 (4th Cir. 2014); Camacho v. Bridgeport Fin., 430 F.3d 1078, 1082 (9th Cir. 2005). Here, Plaintiff avers that during telephone calls, he explained to two NCS representatives that he disputed the debt on two separate occasions and on that the second occasion, the NCS representative admitted that NCS had no information in the file on the matter and agreed to obtain documentation from Thrifty and then return his call. (Am. Compl. ¶¶ 20-22). Instead of resolving Plaintiff's concerns, NCS allegedly did not follow up with him, and reported negative credit information to the consumer reporting agencies more than five times without notifying the consumer reporting agencies that the debt was disputed. (Am. Compl. ¶¶ 20-26, 31, 38). Under these circumstances, Plaintiff states a valid claim for violation of Section 1692e(8).

16

2.      Georgia Fair Business Practices Act

Plaintiff also argues NCS's violations of the FDCPA and the FCRA[1] also violate the FBPA.  (Am. Compl. ¶ 83).  Specifically, Plaintiff argues in his Motion for Default Judgment that NCS's failure to send the required 1692g notice, failure to report his account as disputed when reporting the account to the consumer reporting agencies, and misstatement of the amount owed also violate the GFBPA.  The GFBPA is intended to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce.  Marrale v. Gwinnett Place Ford, 271 Ga. App. 303, 306-07 (2005).  The GFBPA forbids and declares unlawful any unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce.  Id.  The GFBPA is to be construed consistently with

---

[1] In this case, Plaintiff's GFBPA claims relating to NCS's FCRA violations for failure to perform an adequate investigation of Plaintiff's disputes, failure to correct the inaccurate information it gave to the consumer reporting agencies, and failure to report the debt as disputed are not recoverable under the GFBPA because they are preempted by the FCRA.  Section 1681t(b)(1)(F) of the FCRA provides that "[n]o requirement or prohibition may be imposed under the laws of any State (1) with respect to any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies . . . ."  Thus, while Plaintiff may recover under Section 1681s-2 for the aforementioned violations of the FCRA, Plaintiff may not recover for the same conduct under the GFBPA because Plaintiff's GFBPA claims relating to such conduct are preempted.  Collins v. BSI Fin. Servs., No. 2:16-CV-262-WHA, 2016 WL 6776284, at *8 (M.D. Ala. Nov. 15, 2016) (holding that claims premised upon defendant's furnishing inaccurate information to consumer reporting agencies were preempted by Section 1681t(b)(1)(F) and that plaintiff's remedy for defendant's conduct was the FCRA); Rene v. Carrington Mortg. Servs., No. 1:15-CV-02250-ELR-RGV, 2015 WL 12085870, at *8, n.17 (N.D. Ga. Oct. 28, 2015); Knudson v. Wachovia Bank, 513 F. Supp. 2d 1255, 1259 (M.D. Ala. 2007).

interpretations of the Federal Trade Commission Act.   O.C.G.A.  §  10-1-391(b).
Because violations of the FDCPA and FCRA violate the Federal Trade Commission Act,
they may also violate the GFBPA.  Gilmore v. Account Mgmt., Inc., 357 F. App'x. 218,
219-20 (11th Cir. 2009) (concluding that defendant "necessarily violate[s] Georgia's
FBPA when it violate[s] the FDCPA"); Nickens v. Equifax Info. Servs., No. 1:13-CV-
333-TWT, 2013 WL 4786975, at *5 (N.D. Ga. Sept. 6, 2013); 1st Nationwide Collection
Agency, Inc. v. Werner, 288 Ga. App. 457, 459-60 (2007) (explaining that "collecting
a debt incurred during a consumer transaction could harm the general consuming public
if conducted via deceptive acts or practices and clearly falls within the parameters of the
[GFBPA]").

    In order to establish a private cause of action under the GFBPA, however,
Plaintiff must also establish causation and an injury.  Agnew v. Great Atl. & Pac. Tea
Co., 232 Ga. App. 708, 737 (1998).  This is so even when the violation of the GFBPA
is derived from a violation of the FDCPA and even when the FDCPA does not require
demonstration of causation and an injury.  Id. (holding that a successful claimant under
the GFBPA must demonstrate causation and an injury even when the action is based on
a violation of federal trade law and even though federal law does not require
demonstration of injury and causation).

    In this case, Plaintiff alleges that he was injured by NCS's actions in violation of
the FDCPA and the GFBPA because the violations caused him emotional distress and
mental anguish.  Here, Plaintiff claims that his anxiety and sense of powerless increased

as a result of NCS's alleged misinformation and his repeated unsuccessful attempts to correct NCS's incorrect reports. (Pl.'s Decl. ¶¶ 82-86). According to Plaintiff, the worry caused by the matter resulted in him having difficulty sleeping and that he would wake up at night sweating and worried about his credit. (Pl.'s Decl. ¶¶ 83-86). Plaintiff explains that:

> The multiple disputes with Equifax of the NCS tradeline were a nightmare. As each dispute with Equifax brought a "verified" response for NCS, I became more and more upset and overcome by a sense of powerlessness. I was upset and withdrawn and began to be curt with my friends for little or no reason. The FCRA dispute mechanism did not work for me because in response to each dispute, NCS merely verified the debt and failed to provide documentation regarding the debt requested by Equifax or provide any indication that NCS had in fact contacted the original creditor. . . . The stress from not being able to correct the NCS tradeline and the loss of sleep began to infect my day to day existence making me irritable and glum.

(Pl.'s Decl. ¶¶ 86-88). Plaintiff further states that he lost his appetite, and that he experienced depression which negatively impacted his social life. (Pl.'s Decl. ¶¶ 87-90). Plaintiff's colleagues corroborate that Plaintiff experienced mental distress. (Decl. of Marissa Price ¶¶ 15-16; Decl. of Edward Pannell ¶¶ 20-23). NCS does not dispute that Plaintiff experienced depression, irritability, frustration, or loss of sleep, but argues that this type of mental distress is not enough to support Plaintiff's GFBPA claim.[2]

---

[2] NCS also argued Plaintiff provided no evidentiary support for his desired damages. Presumably, NCS bases its argument on the technical problems with Plaintiff's initial Declaration filed in support of his Motion for Default Judgment. As discussed above, however, Plaintiff has corrected the technical deficiencies in his Declaration when he filed his subsequent Declaration. Accordingly, Plaintiff does support his damages claim with competent evidence. NCS also argues that Plaintiff's evidence is not detailed enough. Plaintiff's evidence is sufficiently detailed because he adequately expresses how NCS's conduct led to his frustration, sleeplessness,

19

Despite NCS's arguments to the contrary, the Georgia Court of Appeals has already concluded that aggravation stemming from violations of the GFBPA is an injury compensable under the GFBPA. Regency Nissan, Inc. v. Taylor, 194 Ga. App. 645, 649 (1990) (holding that aggravation suffered by the plaintiff bringing claims under the GFBPA was "actual injury suffered" and that the plaintiff was entitled to damages from that injury); Beringer v. Hearshe Kemp, LLC, No. 1:10-CV-1399-WSD-ECS, Doc. 13 (N.D. Ga. Aug. 31, 2011) (awarding $7,500 in damages due to excessive stress, worry, loss of sleep, and anxiety stemming from violation of the FDCPA and GFBPA); Gilmore v. Acc't Mgmt., No. 1:08-CV-1388-JOF-LTW, 2009 WL 2848278, at *9 (N.D. Ga. Apr. 27, 2009). Moreover, Plaintiff's description of the continued frustration he endured as a result of the ongoing dispute is understandable and credible. Accordingly, this Court finds that NCS's violations of the GFBPA did cause Plaintiff injury.[3]

---

glumness, and hopelessness. (Pl.'s Decl. ¶¶ 82-88, 89-92.)

[3] NCS challenges Plaintiff's evidence supporting the proposition that his credit was damaged by NCS's false reporting to the consumer reporting agencies on the grounds that his supporting evidence is hearsay. This Court agrees with NCS that the evidence upon which Plaintiff relies to support the notion that NCS's actions damaged his credit is hearsay. Although Plaintiff states that his credit card application was denied, his credit score was reduced, and he could not buy a car or rent an apartment because NCS's false reports to the consumer reporting agencies, Plaintiff does not present any supporting proof, other than his own testimony and that of some of his friends who are repeating what he told him. (Pl.'s Decl. ¶¶ 39-43, 76-77, 81); Llewellyn v. Allstate Home Loans, Inc., 711 F.3d 1173, 1180 (10th Cir. 2013) (explaining that statements by plaintiff's broker and accountant that his credit had been ruined were hearsay because they merely recounted the plaintiff's statements and were not based on any personal knowledge). Plaintiff does not present his authenticated credit reports, testimony from the consumer reporting agencies explaining why his credit score decreased, or testimony from the car lender, apartment

3. <u>FCRA Violations</u>

Plaintiff contends in his Complaint that NCS also violated Section 1681s-2(b) of the FCRA when NCS failed to properly investigate his disputes of the debt, failed to accurately responded to verification requests from Equifax and Trans Union, and failed to accurately report the results of an adequate investigation to other consumer reporting agencies. (Am. Compl. ¶ 78). The basis for Plaintiff's FCRA violations as stated in the Amended Complaint appears to be the following: (1) in April 2013, NCS reported to Experian that Plaintiff owed $1,892.00 and that the payment status was seriously past due and failed to report that he disputed the debt; (2) in April 2013, following Plaintiff's dispute of the debt in March 2013, NCS reported to Equifax that Plaintiff owed $1,892.00 and that the status of the debt was unpaid, but failed to report that he disputed the debt; (3) in April 2013, NCS reported to Trans Union that he owed $1,892.00, but that the payment status was "charged off to bad debt" and failed to report that Plaintiff

---

lessor, or credit union explaining why Plaintiff's applications were denied. Plaintiff's conclusory testimony also does not foreclose potential alternate explanations for the decline of his credit score, such as other unpaid debts. Thus, without more, Plaintiff's hearsay testimony, even if considered, is too conclusory to persuade this Court that the reason that his credit score was reduced or the reason he was denied a credit card, car loan, or apartment rental was due to NCS's reports. <u>See</u> <u>Llewellyn</u>, 711 F.3d at 1180 (explaining that plaintiff's evidence was too conclusory to support the notion that his credit score fell because of defendant's violation of the FCRA). That being said, however, Plaintiff also testified in detail that the ongoing unproductive efforts to correct NCS's incorrect damaging reports caused him frustration, anxiety, powerlessness, worry, stress, loss of sleep and appetite and depression. (Pl.'s Decl. ¶¶ 82-88, 89-92). Thus, Plaintiff's evidence still suggests that NCS's actions caused him injury even if NCS's actions are not proved to have directly damaged his credit rating and ability to obtain credit.

disputed the debt; (4) on April 9, 2013, NCS inaccurately replied to Plaintiff's disputes with Equifax that the balance was being reported correctly and that he had an unpaid balance of $1,892.00 as of April 2013 and still did not report that the debt was disputed; and (5) in March 2014, NCS failed to properly investigate Plaintiff's dispute of the debt with Trans Union and instead reported "verified, no change," reported his debt as $2,071, and failed to report that the debt was disputed.   (Am. Compl. ¶¶ 24-31, 35-38).

Plaintiff asserts additional violations of the FCRA in his Motion for Default Judgment.  Plaintiff now contends that NCS violated the FCRA by failing to properly investigate his disputes after he disputed the NCS tradeline with Equifax on April 29, 2013, May 3, 2013, May 6, 2013, and May 8, 2013.  (Pl.'s Br. 50-55).  Plaintiff, however, did not mention violations of the FCRA by NCS on April 29, 2013, or in May 2013 in his Amended Complaint.  This Court cannot consider violations of the FCRA raised for the first time in the Motion for Default Judgment.  "It is well settled that the defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, but the defendant is not held to admit facts that are not well-pleaded." Lary v. Trinity Physician Fin. & Ins. Servs., 780 F.3d 1101, 1106 (11th Cir. 2015); Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975) ("[A] default judgment may be lawfully entered only according to what is proper to be decreed upon the statements of the bill, assumed to be true . . . .").  Thus, NCS cannot be held liable for violations of the FCRA that were not alleged in the Amended Complaint.  Lary, 780 F.3d at 1106; Nishimatsu, 515 F.2d at 1206.  Therefore, the Court will only consider the violations

alleged in the Plaintiff's Amended Complaint and will focus only on the Amended Complaint's well-pleaded facts in determining NCS's liability.  Lary, 780 F.3d at 1106; Nishimatsu, 515 F.2d at 1206; Sabili v. Chase Hotel Mgmt., LLC, No. 6:10-CV-807-Orl-31KRS, 2011 WL 940230, at *3 (M.D. Fla. Feb. 28, 2011) (disregarding additional facts not alleged in the complaint when determining defendant's liability).

The well-pleaded allegations in the Amended Complaint do, however, state violations of the FCRA.  The FCRA requires that "[a] person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate." 15 U.S.C. § 1681s-2(a)(1)(A).  Section 1681s-2(b) of the FCRA requires furnishers of credit information to investigate the accuracy of said information upon receiving notice of a dispute from a consumer reporting agency.  15 U.S.C. § 1681s-2(b).  Plaintiff brings his claim pursuant to 15 U.S.C. § 1681s-2(b).  A consumer has a private right of action against a furnisher of information, for violations of Section 1681s-2(b) if, for instance, the furnisher, after receiving notice of the consumer's dispute from a consumer reporting agency, fails to conduct a reasonable investigation with respect to the disputed information or fails to report the results of the investigation to the consumer reporting agency.  15 U.S.C. § 1681s-2(b); Peart v. Shippie, 345 F. App'x 384, 386 (11th Cir. 2009).  A private right of action against a furnisher only arises under Section 1681s-2(b) after the furnisher has received notice of a dispute regarding the allegedly inaccurate information from the consumer reporting agency.  Anderson v. EMC Mortg. Corp., 631

F.3d 905, 907 (8th Cir. 2011) (holding that the duties of a furnisher of credit information under 15 U.S.C. § 1681s-2(b) are triggered by notice that its information is being disputed from a CRA, not from the consumer); Peart, 345 F. App'x at 386 (holding that § 1681s-2(b) "can be enforced through a private right of action, but only if the furnisher received notice of the consumer's dispute from a consumer reporting agency."); Green v. RBS Nat'l Bank, 288 F. App'x 641, 642-43 (11th Cir. 2008), cert den'd, 129 S. Ct. 929 (2009).  Here, Plaintiff triggers the requirements of Section 1681s-2(b) because he sent Equifax notice of a dispute and Equifax notified NCS, the furnisher, of the dispute and forwarded the dispute to NCS for investigation.  (Am. Compl. ¶¶ 27-29).  Likewise, the Amended Complaint avers that Plaintiff disputed the accuracy of the Trans Union report, that Trans Union communicated with NCS regarding the substance of the dispute, and yet NCS reported again that the results of the investigation were "VERIFIED, NO CHANGE."  (Am. Compl. ¶¶ 35-36).

Furthermore, the Amended Complaint gives sufficient facts, accepted as true, to support the inference that NCS did not perform a reasonable investigation.  Section 1681s-2(b) "requires some degree of careful inquiry by furnishers of information," especially "when a furnisher does not already possess evidence establishing that an item of disputed information is true." Hinkle v. Midland Credit Mgmt., 827 F.3d 1295, 1303-06 (11th Cir. 2016).  A furnisher can satisfy its obligation to perform a reasonable investigation under such circumstances by "uncovering documentary evidence that is sufficient to prove the information is true" or by "relying on personal knowledge

sufficient to establish the truth of the information." Hinkle, 827 F.3d at 1303-06.

The facts alleged in the Amended Complaint make it plausible that NCS did not uncover documentary evidence sufficient to prove the information it reported was true. Around the same time Plaintiff disputed the debt to Equifax in March 2013, Plaintiff also called NCS to dispute the debt. (Am. Compl. ¶¶ 20-23). At that time, an NCS representative could not resolve Plaintiff's concerns and confided that NCS did not have any information about the Thrifty debt in its file. (Am. Compl. ¶¶ 20-23). The NCS representative promised that once additional information was obtained from Thrifty, he would return Plaintiff's phone call. (Am. Compl. ¶¶ 20-23). Because no representative from NCS returned Plaintiff's phone call and NCS repeatedly verified to the consumer reporting agencies that Plaintiff owed the same amount, it is plausible that NCS did not perform any investigation beyond looking at its files. Assuming the facts of the Amended Complaint as true, a mere review of NCS's files would not have been a reasonable investigation because, based on the alleged statements by NCS's representative around the same time period, NCS's file did not contain any information about the debt. (Am. Compl. ¶ 22). Thus, NCS's own files did not contain sufficient information to show that its reporting of the debt was true. (Id.).

The conclusion that NCS did not investigation beyond reviewing its own files is a reasonable inference based on Amended Complaint's allegations. Indeed, had NCS actually obtained the information from Thrifty as its representative promised, and if that information showed that Plaintiff owed the debt to Thrifty as NCS reported to the

consumer reporting agencies, it follows that NCS also would have returned Plaintiff's call in order to assure him that he owed Thrifty and NCS would have continued to try to collect the debt.  Instead, NCS never did so, and never contacted Plaintiff again. (Am. Compl. ¶ 23).  Nevertheless, NCS allegedly continued with its rote reports that the debt was verified and failed to report that the debt was disputed.  (Am. Compl. ¶¶ 25, 29, 31, 37-38).  Thus, under these circumstances, it is plausible that NCS did no more than consult its own files, and as a result, did not perform a reasonable investigation. Hinkle, 827 F.3d at 1305 (describing circumstances where furnisher's mere consultation of its own files that upon which it had based its earlier alleged false report to the consumer reporting agencies was not reasonable investigation); Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1155 (9th Cir. 2009) ("By its ordinary meaning, an 'investigation' requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute."); Scharf v. Trans Union, LLC, No. 14-14322, 2015 WL 6387501, at *1-2 (E.D. Mich. Oct. 22, 2015) (review of own files to determine whether the account is in default and referring further inquiries to lender not reasonable investigation under the circumstances).

Furthermore, it is also plausible that NCS continued to report inaccurate information after its alleged investigation.  Here, Plaintiff alleges that he owed no debt to Thrifty and that he possesses a receipt from Thrifty indicating that he had a zero balance on the account, yet NCS continued to report to consumer reporting agencies that he owed more than a thousand dollars.  (Am. Compl. ¶¶ 11, 24-31, 36-37).  In addition,

26

the amounts sought by Thrifty varied.  Thrifty sought $1,017.41 on August 8, 2012, sought the lower amount of $882.50 on August 10, 2012, and then requested $1,782.61 a week later.  (Am. Compl. ¶¶ 12-16).  When Thrifty submitted the matter to JNR Adjustment, Thrifty indicated that the amount Plaintiff owed again was $882.50.  (Am. Compl. Ex. C).  The balance that NCS reported to the consumer reporting agencies changed yet again.  This time, NCS reported that Plaintiff owed $1,892.00.  (Am. Compl. ¶¶ 24-26, 30-31, 36-37).

Finally, accepting Plaintiff's factual allegations as true, the information NCS reported was also misleading because NCS reported that Plaintiff had not paid the debt, made conflicting reports that the debt was past due or charged off, but did not list the debt as disputed.  (Id.); see, e.g., Saunders v. Branch Banking and Tr. Co., 526 F.3d 142, 149-50 (4th Cir. 2008) (finding that furnishers may provide inaccurate information when they provide the information in a manner as to create a materially misleading impression which could be expected to have an adverse effect and thus, in that case, a jury question existed as to whether furnisher's failure to report that a debt is disputed amounted to inaccuracy); see also Seamans v. Temple Univ., 744 F.3d 853, 867 (3d Cir. 2014) (following Saunders where the consumer's dispute is potentially meritorious); Llewellyn v. Allstate Home Loans, Inc., 711 F.3d 1173, 1185-86 (10th Cir. 2013) (following Saunders); Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1162-64 (9th Cir. 2009) (following Saunders); Bauer v. Target Corp., No. 8:12-CV-978-T-AEP, 2012 WL 4054296, at *3 (M.D. Fla. Sept. 14, 2012) (refusing to dismiss FCRA claim after

27

concluding that a cause of action exists under Section 1681s-2(b) for failing to report that the consumer disputed the debt because the omission could be materially misleading). Here, as discussed above, it is plausible that Plaintiff had a meritorious dispute of NCS's reports of the debts to the consumer reporting agencies. It is also plausible, based on the facts of the Amended Complaint, that the manner in which NCS reported the credit information from Thrifty could materially mislead others. Without the designation that the Thrifty entry was disputed, potential creditors might think that instead of disputing the debt and refusing to pay a debt that Plaintiff claims he did not owe, that Plaintiff did not dispute the debt, that Plaintiff defaulted on the debt, and that Plaintiff refused to pay the debt. This might dissuade potential creditors from extending Plaintiff credit. Thus, it is plausible that NCS violated Section 1681s-2(b) when it did not report Plaintiff's debt as disputed.

## II.   Damages

Plaintiff also contends that he is entitled to the following damages: (1) statutory damages of $1,000 under the FDCPA; (2) general damages in the amount of $12,500 trebled to $37,500 under the GFBPA; (3) actual damages in the amount of $12,500 for injuries caused by NCS's negligent violations of the FCRA; and (4) $75,000 in punitive damages for NCS's willful violations of the FCRA.

### A.   Statutory Damages for FDCPA Claims

Plaintiff seeks the full $1,000 in statutory damages for NCS's violations of the FDCPA because NCS's frequent and persistent noncompliance with the Act caused

erroneous information to appear on his credit reports and caused him emotional distress. While NCS does generally dispute Plaintiff's claim for emotional distress, NCS does not argue that the award for statutory damages should be less than $1,000. The FDCPA provides for statutory damages for violations of Section 1692e and 1692g in an amount not to exceed $1,000.00. 15 U.S.C. § 1692k(a)(2)(A). Statutory damages are limited to $1,000 per action, not per violation. Harper v. Better Bus. Servs., 961 F.2d 1561, 1563 (11th Cir. 1992). Factors to be considered in determining the amount of statutory damages include "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional." 15 U.S.C. § 1692k(b)(1). This Court agrees with Plaintiff that NCS's violations of the Act persisted despite his repeated efforts to notify NCS of the dispute and to clear his credit report. Additionally, NCS's noncompliance could have significantly injured Plaintiff's credit. Accordingly, this Court **RECOMMENDS** that Plaintiff be awarded $1,000.00 in statutory damages.

### B.   General Damages

As discussed above, Plaintiff is entitled to general damages for his mental distress and suffering under the GFBPA. O.C.G.A. § 10-1-399(a) provides that an GFBPA cause of action can be brought "to recover . . . general and exemplary damages sustained as a consequence thereof. . . ." O.C.G.A. § 10-1-399(a). "The expression 'actual damages' or 'general damages' is not necessarily limited to pecuniary loss, or loss of ability to earn money; general damages are those which the law presumes to flow from

any tortious act." Zieve v. Hairston, 266 Ga. App. 753, 759 (2004). Unlike other torts, however, an award for general damages under the FBPA is limited to those damages that can be measured by "actual injury suffered." Compare Moore-Davis Motors, Inc. v. Joyner, 252 Ga. App. 617, 619 (2001) (holding that "an award for general damages under the FBPA is limited to those damages that can be measured by 'actual injury suffered,' and the general provisions of O.C.G.A. § 51-12-2(a) are not applicable") with O.C.G.A. § 51-12-2(a) (providing that "[g]eneral damages are those which the law presumes to flow from any tortious act; they may be recovered without proof of any amount"); see also Regency Nissan, Inc. v. Taylor, 194 Ga. App. 645, 649 (1990). Wounding a man's feelings is an actual injury and results in actual damages. Zieve, 266 Ga. App. at 759. Thus, damages for mental anguish are available under the GFBPA. See Regency Nissan, 194 Ga. App. at 649 (holding that trial court record which contained evidence of aggravation suffered by the plaintiff bringing claims under the GFBPA, did contain evidence of some "actual injury suffered" even though plaintiff elected at trial not to place a dollar amount on the aggravation he suffered); see also Gilmore v. Acc't Mgmt., No. 1:08-CV-1388-JOF-LTW, 2009 WL 2848278, at *9 (N.D. Ga. Apr. 27, 2009) .

In this case, Plaintiff requests $12,500 in general damages due to his mental distress, frustration, sleeplessness, loss of appetite, stress resulting from NCS reporting the debt without noting the dispute and misrepresenting the amount of the debt. While this Court is persuaded that Plaintiff suffered from mental distress, frustration,

sleeplessness, loss of appetite, and stress as a result of NCS's violations of the GFBPA, Plaintiff's request for a $12,500 award is excessive. Given that NCS's violations of the GFBPA were repetitive causing Plaintiff considerable stress and aggravation on a regular basis, the Court concludes that he should be awarded $7,000 in general damages for his mental distress and related symptoms.

### C.    **Treble Damages**

Plaintiff requests that the Court treble his general damages resulting from NCS's violations of the GFBPA because the violations were intentional. In support, Plaintiff contends that because he phoned NCS and disputed the debt and because consumer reporting agencies requested reinvestigation of the debt, NCS was aware that he disputed the debt. Nevertheless, NCS ignored the dispute and reported the debt as undisputed which demonstrates that his violations were intentional. NCS contends that Plaintiff is not entitled to treble damages under the GFBPA because he has not pled or introduced evidence demonstrating that he provided ante-litem notice to NCS thirty days prior to filing suit as required by O.C.G.A. § 10-1-399(b). NCS does not otherwise dispute Plaintiff's entitlement to treble damages.

This Court is not persuaded by NCS's argument that Plaintiff's claim for treble damages is barred for failure to provide an ante litem notice. Under O.C.G.A. § 10-1-399(b), Plaintiff is required to provide a written demand for relief prior to filing any such action. Plaintiff, however, states in his Amended Complaint, that on or about January 22, 2014, he notified NCS of the nature of his claims under the GFBPA, but

AO 72A
(Rev.8/82)

NCS did not timely respond or offer any settlement of his injuries.  (Am. Compl. ¶ 84).

Additionally, the ante litem notice requirement does "not apply if the prospective

respondent does not maintain a place of business or does not keep assets within the

state." O.C.G.A. § 10-1-399(b).  Here, NCS does not allege that it maintains a place of

business in Georgia or keeps assets inside the state.  Plaintiff's Complaint states NCS

is a California corporation, which NCS does not dispute.  (Am. Compl. ¶ 5).  Likewise,

the Georgia Corporations Division reflects that NCS is a foreign profit corporation

which has a principal office in Van Nuys, California.  See Georgia Secretary of State,

C o r p o r a t i o n s   D i v i s i o n ,

https://ecorp.sos.ga.gov/BusinessSearch/BusinessInformation?businessId=2028779&

businessType=Foreign%20Profit%20Corporation (last visited Feb. 10, 2017).  Thus,

there is no indication here that NCS maintained a place of business or kept assets within

Georgia.  Therefore, this court cannot conclude that Plaintiff was required to provide

NCS a written demand before filing his GFBPA claim.  See, e.g., Beeler v. Ditech Fin.,

No. 5:16-CV-54 (CAR), 2016 WL 4136513, at *4 (M.D. Ga. Aug. 1, 2016) (refusing

to dismiss FBPA claim for failing to comply with requirements of O.C.G.A. § 10-1-

399(b) where there was no indication that the defendant maintained a place of business

or kept assets within Georgia).

Furthermore, assuming the facts in the Amended Complaint to be true, Plaintiff's

general damages should be trebled because it is plausible that NCS's violations of the

GFBPA were intentional.  If an intentional violation of the GFBPA is found, treble

damages are mandatory.  Conseco Fin. Servicing Corp. v. Hill, 252 Ga. App. 774, 778 (2001).  "The intentional violation as contemplated by the [GFBPA] is a volitional act constituting an unfair or deceptive act or practice conjoined with culpable knowledge of the nature (but not necessarily the illegality) of the act."  Paulk v. Thomasville Ford Lincoln Mercury, Inc., 317 Ga. App. 780, 784 (2012); Colonial Lincoln-Mercury Sales, Inc. v. Molina, 152 Ga. App. 379, 383 (1979).

The facts alleged in the Amended Complaint support the conclusion that NCS's violations were intentional because not only had Plaintiff given NCS notice that he disputed the debt on two separate occasions via telephone, but also the consumer reporting agencies notified NCS that Plaintiff had disputed the debt and requested that NCS investigate the disputes.  (Am. Compl. ¶¶ 20-31, 35-38).  Despite Plaintiff's repeated disputes, NCS omitted to report the debt as disputed on approximately six separate occasions.  (Id.).  Additionally, accepting the facts of the Amended Complaint as true, despite Plaintiff's multiple disputes, NCS continued reporting amounts that he owed for the Thrifty debt.  (Id.).  Not only did NCS report different amounts for the debt, but NCS also reported different statuses of the debt.  NCS reported on several occasions that Plaintiff owed $1,892.00, and on another occasion $2,071.00.  (Am. Compl. ¶¶ 24-26, 29-31, 38).  NCS further reported the debt as being "seriously past due," unpaid, and charged off due to bad debt.  (Am. Compl. ¶¶ 24-26, 30).  Thus, given the different statuses and amounts for the debt, it can be inferred that NCS knew that at least some of the amounts and statuses were inaccurate.  (Am. Compl. ¶¶ 11, 24-31, 35-

38).  Under these circumstances, the Court concludes that the violations of the GFBPA were intentional in an effort to persuade Plaintiff to pay the alleged debt.  See, e.g., Gilmore v. Acc't Mgmt., No. 1:08-CV-1388-JOF-LTW, 2009 WL 2848278, at *11 (N.D. Ga. Apr. 27, 2009) (concluding that violations were intentional where defendant signed for plaintiff's letter disputing the debt, yet failed to communicate the dispute to the consumer reporting agency and defendant threatened to file a lawsuit in order to secure plaintiff's payment of a debt plaintiff did not owe when it could not lawfully do so because it had not yet validated the debt); Werner, 288 Ga. App. at 460 (concluding that treble damages were warranted where collection agency failed indicate that plaintiff had disputed the debt in credit reports, falsely represented that it made a demand for payment of the debt by plaintiff when no such demand had been made, and continued to report incorrect balance information even though collector's lawsuit against the plaintiff had dismissed on the grounds that no debt was owed).

Treble damages are dependent on injury or damage resulting from a violation of the GFBPA.  Agnew, 232 Ga. App. at 710.  Thus, because the GFBPA does not offer statutory damages, Plaintiff is not entitled to treble the $1,000 in statutory damages awarded pursuant to the FDCPA.  See O.C.G.A. § 10-1-399; Gilmore, 2009 WL 2848278, at *11.  Therefore, the only damages which may be trebled are Plaintiff's $7,000 in general damages.  Therefore, Plaintiff should be awarded $21,000 in trebled damages.

34

**D.    FCRA Damages**

The FCRA allows for recovery against a furnisher of credit information for negligent and willful violations of the FCRA.  15 U.S.C. §§ 1681n, 1681o.  Plaintiff contends that he is entitled to actual damages for negligent violation of the FCRA as well as costs and attorney's fees.  Specifically, Plaintiff seeks damages for injury to reputation and creditworthiness, humiliation, and mental distress.  Plaintiff further contends that he is entitled to punitive and statutory damages for each FCRA violation because NCS's violations of the FCRA were willful.  Plaintiff argues that NCS's violations of the FCRA were willful because it repeatedly reported the Thrifty debt on at least six times without noting that the debt was disputed and failed to conduct a reasonable reinvestigation on multiple occasions.  Plaintiff argues that as a result, he is entitled to $75,000 in punitive damages.  NCS argues in response that there is no proof that it acted willfully because there is no evidence showing that its actions were knowing and intentional or that NCS acted with a conscious disregard of Plaintiff's rights under the FCRA.  In support, NCS argues that there is no indication that the information NCS learned from Thrifty justified a change in NCS's reporting, and that NCS did not refuse to investigate or withhold information.  NCS further argues that punitive damages are unwarranted because its actions did not risk the health and safety of others, Plaintiff was not an unsophisticated individual or financially vulnerable, there is no evidence that NCS has repeated the conduct, and there is no showing that the harm to Plaintiff was the result of intentional malice, trickery, or deceit.

35

Under Section 1681n(a), a person who willfully fails to comply with any requirement imposed under Section 1681s-2(b), is liable to the consumer for actual, statutory, or punitive damages.  15 U.S.C. §§ 1681n, 1681s-2(b), 2(c); Collins v. Experian Info. Solutions, 775 F.3d 1330, 1336 (11th Cir. 2015).  To prove a willful violation, a consumer must prove that the furnisher either knowingly or recklessly violated the requirements of the Act.  Levine v. World Fin. Network Nat'l Bank, 554 F.3d 1314, 1318 (11th Cir. 2009) (citing Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 56-57 (2007)); see also Collins, 775 F.3d at 1336.  Here, no facts within the Amended Complaint support the notion that NCS knew that its actions in failing to expand its investigation beyond its own files and in failing to report that the debt was disputed would violate the FCRA.  In fact, the factual allegations within the Amended Complaint do not address what NCS knew, other than NCS knew that Plaintiff had disputed the debt.

Furthermore, the facts as alleged in the Amended Complaint are not sufficient to support the notion that NCS's violation of the FCRA amounted to a reckless disregard of the FCRA's requirements.  The reckless disregard of a requirement of the FCRA also qualifies as a willful violation.  Recklessness entails an unjustifiably high risk of harm that is either known or so obvious that it should be known.  Keller v. Macon Cty. Greyhound Park, Inc., 464 F. App'x 824 (11th Cir. 2012) (citing Safeco, 551 U.S. at 56-57); Levine, 554 F.3d at 1318.  "A company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the

36

statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." Collins, 775 F.3d at 1336 (explaining that merely failing to take steps other than contacting collector with ACDV form regarding the disputed entry might have been negligent, but willfulness or recklessness is a higher standard) (citing Safeco, 551 U.S. at 69). In determining whether an interpretation is a reasonable reading of the statute's terms, the court assesses whether the reading "has a foundation in the statutory text" or whether the party interpreting the statute "had the benefit of guidance from the courts of appeals," or federal regulatory agencies "that might have warned it away from the view it took." Safeco, 551 U.S. at 69-70; Seamans v. Temple Univ., 744 F.3d 853, 867-68 (3d Cir. 2014). Whether the defendant exhibited subjective bad faith does not play a part in the calculus of whether a furnisher acted knowingly and recklessly for purposes of Section 1681n(a) when the company's reading of the statute is not objectively unreasonable. Safeco, 551 U.S. at 70, n.20; Levine, 554 F. 3d at 1319.

Based on the state of the law at the time NCS made its credit reporting decisions in 2013, this Court cannot conclude that NCS intentionally violated the FCRA or acted in reckless disregard of its provisions. The Eleventh Circuit Court of Appeals in Hinkle v. Midland Credit Mgmt., 827 F.3d 1295 (11th Cir. 2016), recently found in July of 2016, that the scope of a furnisher's duty to investigate under Section 1681s-2(b) was an issue of first impression in the Eleventh Circuit. Id. at 1301-02. The Eleventh Circuit acknowledged that "the structure of the [FCRA did] not specify the nature and extent of

37

the 'investigation' a furnisher of information must conduct under Section 1681s-2(b)."
Hinkle, 827 F.3d at 1301-02. The Eleventh Circuit went on to conclude that
reasonableness is the touchstone for evaluating investigations under Section 1681s-2(b)
and that the determination of whether the investigation is reasonable will vary depend
on the circumstances of the case and whether the investigation is being conducted by a
consumer reporting agency or a furnisher. Hinkle, 827 F.3d at 1301-02. But the existing
state of the law in the Eleventh Circuit in 2013, did not answer the question of how
extensive a furnisher's investigation must be and whether the furnisher had the duty to
investigate beyond the information contained in its own files, especially under the
circumstances of this case where there are no factual allegations concerning the level of
detail in the consumer reporting agencies request for investigation. See Hinkle, 827 F.3d
at 1301-02; see also Taylor v. Ga. Power Co., No. 215-06, 2016 WL 6836935, at *3
(S.D. Ga. Nov. 18, 2016) (relying on cases that were decided prior to Hinkle to
determine that a furnisher need do no more than verify that the reported information is
consistent with the information in its records for its investigation to be reasonable).
Likewise, while it is a reasonable reading of Section 1681s-2(b) that it is misleading, and
therefore, inaccurate, for a furnisher to report a debtor's negative credit information
without also reporting that the debtor has disputed the debt, there is no binding case law
standing for the proposition in the Eleventh Circuit. Indeed, the Eleventh Circuit had
expressly left open the question of whether a consumer reporting agency satisfies its duty
to provide an accurate credit report when it produces factually correct information about

38

a consumer that might nonetheless be misleading or incomplete in some respect.  Ray
v. Equifax Info. Servs., LLC, 327 F. App'x 819, 826 n.3 (11th Cir. 2009) (citing Cahlin
v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1157 (11th Cir. 1991)).  Thus, it was
not clear within the Eleventh Circuit whether the omission of information, such as
whether the debt was disputed, amounts to an inaccuracy on a credit report.  Therefore,
while this Court agrees with Plaintiff that accepting the facts of the Amended Complaint
as true, NCS's investigation was not reasonable and reporting the account without
reporting that the debt was disputed was inaccurate, this Court's conclusion in this
regard, while reasonable, would not be a foregone conclusion in 2013.  Accordingly, this
Court cannot conclude that NCS's violations of the FCRA were willful or that punitive
damages are warranted under the facts of this case.  See, e.g., Collins, 775 F.3d at 1336;
Steed v. Equifax Info. Servs., No. 1:14-CV-00437-SCJ-CMS, 2016 WL 7888040, at *16
(N.D. Ga. July 15, 2016) (explaining that punitive damages were unwarranted under the
FCRA because issue governing case was never litigated by the court of appeals and there
was no authoritative regulatory guidance or clear statutory text); Torongo v. Roy, 176
F. Supp. 3d 1320, 1323-24 (S.D. Fla. 2016) (rejecting punitive damages claim because
the plaintiff did not plead any facts tending to show that defendant knew its conduct was
violating the law or that defendant's interpretation of the law was contrary to existing
clear statutory or regulatory authority); Pedro v. Equifax, Inc., 186 F. Supp. 3d 1364,
1369 (N.D. Ga. May 12, 2016) (concluding that punitive damages were not appropriate
because there was lack of clarity in existing law).

That being said, the facts of the Amended Complaint do support liability for negligence, and as a result, Plaintiff would be entitled to an award of his actual damages sustained as a result of NCS's violations of the FCRA.  Section 1681o of the FCRA governs civil liability for negligent noncompliance with the statute and provides for recovery of any actual damages sustained by the consumer as a result of the defendant's violations of the FCRA.  15 U.S.C. § 1681o(a)(1); Collins, 775 F.3d at 1334.  Actual damages for negligent violation of the FCRA include "damages for humiliation, mental distress  or  injury  to  reputation  and  creditworthiness."    Smith  v.  E-Backgroundchecks.com, Inc., 81 F. Supp. 3d 1342, 1364 (N.D. Ga. 2015); Abdo v. Sallie Mae, No.  3:11-CV-111-J-32-JRK, 2014 WL 3053172, at *2 (M.D. Fla. July 7, 2014) (explaining that plaintiff's testimony that he suffered shame, embarrassment, humiliation, emotional distress, mental distress, stress, and hurt feelings due to furnisher's violation of the FCRA sufficiently created issue of material fact as to whether plaintiff suffered damages); Jordan v. Equifax Info. Sys., 410 F. Supp. 2d 1349, 1356 (N.D. Ga. 2006) (explaining that actual damages under the FCRA may include damages for humiliation, anger, frustration, embarrassment, or mental distress, even if the consumer has suffered no out of pocket losses); see also Bach v. First Union Nat'l Bank, 149 F. App'x 354, 361 (6th Cir. 2005) (finding that record supported jury's award of damages where plaintiff and his wife testified that plaintiff was depressed, angry, stressed, down in the dumps, ashamed, and embarrassed and explained how the violations of the FCRA led to emotional injuries).  Many courts have not hesitated to

40

find that mental distress damages were warranted for negligent violations of the FCRA even when the plaintiff has not shown to have obtained medical care or suffered any physical injury. <u>See, e.g.</u>, <u>Abdo</u>, 2014 WL 3053172, at *2 (finding that plaintiff raised a genuine issue of material fact as to whether she suffered damages pursuant to Section 1681o where plaintiff explained that he suffered multiple years of injury to his reputation, shame, embarrassment, stress, humiliation, and hurt feelings); <u>King v. Asset Acceptance, LLC</u>, 452 F. Supp. 2d 1272, 1280-81 (N.D. Ga. 2006) (finding that plaintiff satisfactorily offered sufficient proof of emotional distress damages of embarrassment, frustration, and irritability stemming from negligent violations of the FCRA where he testified regarding the same); <u>Moore v. Equifax Info. Servs. LLC</u>, 333 F. Supp. 2d 1360, 1365 & n.3 (N.D. Ga. 2004) (noting that damages for mental distress are recoverable for negligent violations of the FCRA even if the consumer has suffered no out-of-pocket losses); <u>cf</u>. <u>Levine v. World Fin. Network Nat'l Bank</u>, 437 F.3d 1118, 1124 (11th Cir. 2006) (recognizing that some courts have already concluded that plaintiff may recover for emotional distress in the absence of physical injury or out-of-pocket expenses as actual or compensatory damages for violations of the FCRA); <u>Smith</u>, 81 F. Supp. 3d at 1364 (explaining that the court could not say that plaintiff was not entitled to recover damages for emotional distress even though plaintiff never sought any medical treatment for the harms he suffered as a result of FCRA violations).

Here, Plaintiff explains in detail that the multiple disputes of the NCS tradeline were "a nightmare," and that each time he disputed the debt with Equifax, a verified

response from NCS followed.  (Pl.'s Decl. ¶ 86).  Plaintiff states that NCS never indicated that it had bothered to contact Thrifty.  (Id.).  Plaintiff explains that as a result, he felt upset and powerless and withdrew from his friends.  (Id.).  Plaintiff also claims that he lost his appetite and experienced disruption to his sleep. (Id. at 87-88).  Thus, an award of damages for mental distress is appropriate.

That being said, this Court cannot distinguish the mental distress caused by Plaintiff's violations of the FDCPA and the GFBPA with his violations of the FCRA. Thus, while the Court believes that $7,000 in actual damages for Plaintiff's mental distress resulting from the violations of the FCRA is appropriate, Plaintiff has already been awarded damages for his mental distress in connection with his violations of the FDCPA and the GFBPA.  A plaintiff may not receive duplicate recovery for the same injury.  St. Luke's Cataract and Laser Inst. v. Sanderson, 573 F.3d 1186, 1203-04 (11th Cir. 2009).  District courts are required to preclude double recovery by an individual. Id.  Thus, this Court cannot recommend awarding the same mental distress damages twice.  Accordingly, while the Court agrees that Plaintiff suffered $7,000 in mental distress damages as a result of NCS's FCRA violations, this Court declines to award an additional $7,000 because he has already been awarded $7,000 in mental distress damages relating to the same course of conduct which also happened to violate the FDCPA and the GFBPA.

### E.    Attorney Fees

Plaintiff also contends that he seeks an award of attorney's fees pursuant to the

AO 72A
(Rev.8/82)

FDCPA, the GFBPA, and the FCRA. (Pl.'s Br. 5 n.2). NCS contends that Plaintiff should not be awarded attorney's fees because he does not present any proof of the amount of fees he desires. To the extent that Plaintiff seeks recovery for his fees, he may file a motion seeking his fees if the District Court adopts this Court's Report and Recommendation and/or enters a default judgment. Assuming the District Court enters a default judgment, Plaintiff may file his motion for attorney's fees within fourteen (14) days after the District Court's Order entering default judgment.

## CONCLUSION

For the foregoing reasons, NCS's Motion to Strike is **DENIED** (Doc. 86), and Plaintiff's Motion to Permit Filing of Brief in Excess of Twenty-Five Pages and to Permit Supplementary Filing of Declarations is **GRANTED** (Doc. 88). This Court **RECOMMENDS** that Plaintiff's Motion for Default Judgment should be **GRANTED IN PART**. (Doc. 83). This Court further **RECOMMENDS** that Plaintiff be awarded $1,000 in statutory damages pursuant to the FDCPA and that the $7,000 in mental distress damages compensable under the GFBPA be trebled to $21,000. Thus, Plaintiff's total damage award should be $22,000. As this is a final Report and Recommendation and there are no other matters pending before this Court, the Clerk is directed to terminate the reference to the undersigned.

AO 72A
(Rev.8/82)

**SO ORDERED AND REPORTED AND RECOMMENDED**, this <u>22nd</u> day of February, 2017.

/s/LINDA T. WALKER
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)